# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-60436

United States Court of Appeals
Fifth Circuit

**FILED**
July 18, 2019

Lyle W. Cayce
Clerk

SOUTHERN HENS, INCORPORATED,

> Petitioner

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION; R.
ALEXANDER ACOSTA, SECRETARY, DEPARTMENT OF LABOR,

> Respondents

Petition for Review of an Order of the
Occupational Safety and Health Review Commission

Before HIGGINBOTHAM, SMITH, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

A worker at a poultry processing plant operated by Southern Hens, Incorporated suffered a serious injury when her hand got caught in a machine's moving parts. Southern Hens reported the injury to the Occupational Safety and Health Administration, which conducted an inspection of the plant and then cited Southern Hens for violations of occupational safety standards. After an evidentiary hearing, an administrative law judge found violations of two standards, declined to find a violation of a third standard, and imposed a monetary penalty. Southern Hens petitioned for review, and we deny the petition.

No. 18-60436

## I

## A

Southern Hens operates a plant with roughly 700 employees in Moselle, Mississippi, just north of Hattiesburg. During day shifts at the plant, employees process poultry, while the night shift is devoted to cleaning the plant and its machines. Sheila Norman started working at Southern Hens on June 21, 2016, and was assigned to the night shift, during which she would clean a machine called the Short Weight Tumbler. Southern Hens describes this machine rather vividly as follows: "A 'Short Weight Tumbler' is a machine that moves meat pieces around so that they knock against each other and the sides of the tumbler. The abrasion loosens problem strands in the meat allowing fat in the muscle fibers to absorb liquid." The Secretary of Labor, defending the ruling of the administrative law judge in this appeal, gives this description: "During the processing, chicken parts are placed in a machine called a Tumbler where a drum spins rapidly to remove moisture from the chicken. The drum is large enough for an employee to enter it through the front of the Tumbler."

Cleaning the Tumbler was Norman's regular assignment, and she cleaned the machine four or five nights a week. Norman would first open "doors" on the Tumbler that guarded its moving parts. She would then turn the machine on, so that she could hose it down while the machine was moving. She would apply foaming chemicals to the outside of the machine and then scrub the outside by hand with a scrubbing pad. The Secretary says that this brought her hand within seven inches of the Tumbler's "drive mechanism." Norman would then turn off the machine, lock it out to prevent it starting up

2

unexpectedly,[1] and climb into the drum to scrub it from the inside. Afterwards, she would turn the machine back on to hose it down one last time.

On August 4, 2016, Norman had applied foaming chemicals to the Tumbler with the machine running and had climbed a ladder to reach the higher parts of the machine. She was scrubbing the outside of it when her glove became caught in the drive mechanism. Once she got her hand free and removed the glove, she saw that her thumb had been, as the ALJ put it, "partially amputated." Norman ran to her manager, Greg Webb, with whom she waited for the Safety Coordinator, Matt Lee, who then took her to the hospital. Norman seems to have missed work for several months thereafter.[2]

B

Southern Hens reported Norman's injury to the Occupational Safety and Health Administration (OSHA), which opened an investigation conducted by Compliance Safety and Health Officer David Young. He reviewed documents, interviewed personnel, and did a walkthrough of Plant No. 3 at Southern Hens' Moselle facility, which contained the Tumbler.

Young's investigation went beyond Norman's injury. During his walkthrough, Young passed by two parallel conveyors that fed chicken parts into a chiller to be frozen. Young observed a Southern Hens employee, Dmitri Hunt, clearing a jam on one of the conveyors. Hunt at first was using a "metal rake-like tool" to clear the jam but then resorted to using his hands. In the process, his hands came within a few inches of a "pinch point" below the

---

[1] OSHA regulations define a "lockout device" as a "device that utilizes a positive means such as a lock . . . to hold an energy isolating device in a safe position and prevent the energizing of a machine or equipment." 29 C.F.R. § 1910.147(b). An "energy isolating device," in turn, is a "mechanical device that physically prevents the transmission or release of energy," for instance, a "manually operated electrical circuit breaker" or a "disconnect switch," among other possibilities. *Id.*

[2] In January 2017, after Norman returned to work, Southern Hens disciplined her for not locking out the Tumbler, but she disagreed that the injury was her fault.

conveyor. Young noted that the conveyor being cleared by Hunt lacked a protective guard over the pinch point, whereas the parallel conveyor nearby was guarded. Hunt explained to Young that he had been working at Southern Hens for three weeks, and in that time, jams were frequent. He often used his hands because the metal tool was too heavy for continuous use.

Following the inspection, Young recommended three serious citation items. The first two arose from Norman's injury and concerned Southern Hens' compliance with lockout-tagout regulations: 29 C.F.R. § 1910.147(c)(4), requiring companies to maintain detailed procedures for locking or tagging out equipment; and § 1910.147(d)(4)(i), requiring a lock or tag to be affixed to machines during servicing or cleaning. The third arose from observing Hunt clearing the conveyor jam with his hands and concerned compliance with a machine-guarding standard: 29 C.F.R. § 1910.212(a)(1), requiring guards on machines that pose hazards from "ingoing nip points," among other features.

C

Southern Hens contested the citation items, leading to a one-day evidentiary hearing in October 2017 before an administrative law judge in Jackson, Mississippi. Three witnesses testified: Norman, the injured employee; Young, the OSHA compliance officer; and Lee, Southern Hens' safety coordinator. Webb, Norman's manager, did not testify.

As to Norman's injury, much of the hearing focused on the training that Southern Hens provided on lockout-tagout concepts and procedures. Norman testified that she received general lockout-tagout training when she started work, including a video that showed the risk of injury from machines that move or turn on unexpectedly. The video was not specific to the Tumbler. According to Norman, Webb told her she would be trained by another Southern Hens

employee, "Jesse,"[3] "because this used to be his job . . . whatever he shows you, that's what you do and how you do it." Jesse had cleaned the Tumbler before Norman received the assignment, and Norman related the following guidance from Jesse on the appropriate time to lock out the Tumbler:

> I had to climb on the inside of [the Tumbler], you know, and bend down and spray down. He was teaching me how to do that. And he was, like, you gotta go on the inside of it, you know. That's when you go get the lock and you lock it out. And he was, like, get a ladder and you climb on the inside of it and you lock it out, and then you get on the inside.

Norman testified that she was never shown written lockout-tagout procedures for the Tumbler or given training specific to the machine beyond what Jesse provided. She also said that Webb, her manager, added little to Jesse's training, even though he regularly passed by while she was working. She received no specific guidance from Webb on when to lock out the Tumbler.

Norman did receive a notable instruction from Webb on one occasion. One day, Norman was preparing to foam the Tumbler, the step that preceded scrubbing it by hand, and had turned off the machine. "Greg [Webb] walked in and was like, 'Jesse, you didn't tell her that the machine is supposed to be on . . . while she is foaming it down?'"

In response, Southern Hens focused on the general safety training given to Norman, on regular safety meetings at which lockout-tagout was on the agenda, and on a set of general safety rules. Those rules included the following broad statements: "Keep hands off moving machinery."; "Be sure you are using the proper equipment, chemical or material for the job. If unsure, ask your immediate supervisor."; and "Keep clear of all belts, chains, and moving lines."

---

[3] This individual was not identified in the record. The transcript of the hearing spelled his name "Jesse," the ALJ spelled it "Jessie," and the Secretary's brief uses both. Testimony indicated this individual is male, so we use "Jesse."

No. 18-60436

Young's testimony was mainly not about Norman, but Southern Hens used its cross-examination to establish that Young did not cite the company for failing to train Norman on lockout procedures.[4] Southern Hens also drew attention to the fact that it had disciplined Norman after the incident, but Young retorted that the company should have dealt with the issue before Norman's injury. Young pointed out that a similar injury on the Tumbler in December 2015 had caused another worker to miss 70 days of work.

Safety Coordinator Matt Lee explained the company's process for training new employees such as Norman: training on general rules; video training on lockout-tagout concepts; and then specific training on equipment from "their supervisor or a trainer in that area." Southern Hens used Lee to introduce an incident report that Jamie Gibbs, another supervisor, completed immediately after Norman's injury. Gibbs recorded Norman saying that she was distracted and should not have come to work due to problems at home. Lee also testified about Southern Hens' practices of disciplining employees and conducting unannounced safety audits, but cross-examination established, among other points, that Lee had no record of doing a safety audit while Norman was on the Tumbler.

The machine-guarding issue took up most of Young's testimony. Young related seeing the two parallel conveyor lines, one guarded and one not; Dmitri Hunt "working very fast . . . to unclog a[n] area" on the unguarded line; and Hunt using his hands rather than the metal tool to clear the jam. As Hunt did so, his fingers were "1-to-2 inches" from an opening at the bottom of the conveyor "approximately half [an] inch" in size, which Young described as "a place to get caught in, a pinch point." Young also discussed an "Employee

---

[4] *See* 29 C.F.R. § 1910.147(c)(7) (requiring employers to train employees on "energy control" concepts and skills).

6

Questionnaire," which he filled out with Hunt's input and assent. Hunt said that he had been at Southern Hens three weeks; that he "use[d] [his] hand to do this all day"; and that he did not use the metal tool because "it gets heavy." Finally, Young related a statement from Scott French, a manager at Southern Hens, who acknowledged the jamming issues in this part of the plant.

In a comprehensive reasoned decision, the ALJ affirmed two of the three citations recommended by Young.[5] She rejected the first recommended lockout-tagout violation, concerning the requirements for written procedures under 29 C.F.R. § 1910.147(c)(4)(ii)(B). That regulation "is concerned with the 'how' of the lockout procedures, not the 'when,'" and Southern Hens' procedure for the Tumbler was adequate in that regard. By contrast, the ALJ found that Southern Hens had violated 29 C.F.R. § 1910.147(d)(4)(i), which requires a lockout device to be affixed during servicing or cleaning, because the Tumbler was not locked out for the cleaning process that resulted in Norman's injury. The ALJ rejected Southern Hens' affirmative defense that Norman's injury resulted from "unpreventable employee misconduct." The ALJ also found that Southern Hens had violated 29 C.F.R. § 1910.212(a)(1) by not guarding the pinch point on the conveyor worked by Hunt. Finally, she deemed both violations "serious," owing mainly to the gravity of the injuries that could (and, in Norman's case, did) result. Consequently, she penalized Southern Hens $7,000 for the lockout-tagout violation and $5,000 for the machine-guarding violation.

---

[5] This decision rested on the ALJ's findings that Norman was credible and that Southern Hens had put forward little that rebutted her testimony: "I found the injured employee's testimony credible. She did not appear practiced or rehearsed. Although she was occasionally confused by the wording of some questions, her demeanor when testifying evinced an earnest attempt to provide an honest answer. Her testimony on cross examination was consistent with that on direct. Little of her testimony was rebutted. Neither Jessie nor Manager Webb were [sic] called to testify."

No. 18-60436

Southern Hens timely sought review from the Occupational Safety and Health Review Commission. The Commission declined discretionary review, so the ALJ's decision became a "final order of the Commission."[6] Southern Hens timely petitioned this court for review.

## II

This court must accept findings of fact by the Commission as "conclusive" if they are supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a); *Sanderson Farms, Inc. v. Perez*, 811 F.3d 730, 734 (5th Cir. 2016). The court must "uphold factual findings if a reasonable person could have found what the Commission found, even if the appellate court might have reached a different conclusion." *Sanderson Farms*, 811 F.3d at 734. (quotation omitted). The court reviews legal conclusions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Sanderson Farms*, 811 F.3d at 735; *Trinity Marine Nashville, Inc. v. O.S.H.R.C.*, 275 F.3d 423, 427 (5th Cir. 2001). The same standards apply to review of ALJ decisions that the Commission declines to review as to decisions of the Commission itself. *Austin Indus. Specialty Servs., L.P. v. O.S.H.R.C.*, 765 F.3d 434, 438–39 (5th Cir. 2014) (per curiam).

## III

The Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.*, is meant "to assure so far as possible every working man and woman in the

---

[6] *See* 29 U.S.C. § 661(j) ("The report of the administrative law judge shall become the final order of the Commission within thirty days after such report by the administrative law judge, unless within such period any Commission member has directed that such report shall be reviewed by the Commission.").

Nation safe and healthful working conditions." *Id.* § 651(b). The Act imposes a general duty on employers to furnish employees a workplace "free from recognized hazards that are causing or are likely to cause death or serious physical harm." *Id.* § 654(a)(1). It also authorizes the Secretary of Labor to promulgate occupational safety and health standards. *Id.* § 655(a). The Act assigns enforcement and rulemaking authority to the Secretary, while assigning adjudicative authority to the Commission, an independent agency. *Martin v. O.S.H.R.C.*, 499 U.S. 144, 151 (1991).

Despite its lofty goals, the Act did not create a strict liability regime. Under the Act, the employer is not made into "an insurer" of its employees. *Horne Plumbing & Heating Co. v. O.S.H.R.C.*, 528 F.2d 564, 570 (5th Cir. 1976). Rather, "the Act seeks to require employers to protect against preventable and foreseeable dangers to employees in the workplace." *W.G. Yates & Sons Constr. Co. v. O.S.H.R.C.*, 459 F.3d 604, 607 (5th Cir. 2006).

To establish an employer has violated a regulation, the Secretary has the burden to prove (1) "that the cited standard applies"; (2) that the employer has not complied with the cited standard; (3) that employees have "access or exposure to the violative conditions"; and (4) "that the employer had actual or constructive knowledge of the conditions," i.e., that it actually knew of the conditions or, with the exercise of reasonable diligence, should have known. *Sanderson Farms*, 811 F.3d at 735.

A violation may be characterized as "willful," "serious," or "not serious," which shapes the penalty possibilities. *See* 29 U.S.C. § 666. A "serious" violation exists "if there is a substantial probability that death or serious physical harm could result" from a condition or practice, "unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." *Id.* § 666(k).

No. 18-60436

IV

Southern Hens challenges the lockout-tagout violation on the grounds that it lacked knowledge of the violative condition and that Norman's injury resulted from misconduct that the company could not prevent. Southern Hens argues against the machine-guarding violation on the grounds that employees were not exposed to a violative condition, that it lacked knowledge of the violative condition, and perhaps also that the condition was not actually violative. Southern Hens adds that the machine-guarding violation, if upheld, should not be deemed serious. Finally, Southern Hens contests the ALJ's penalty determination on the ground that the Secretary impermissibly requested a penalty exceeding the statutory maximum. We reject each challenge.

A

The ALJ penalized Southern Hens for violating the lockout-tagout standard at 29 C.F.R. § 1910.147(d)(4). Section 147 "covers the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." *Id.* § 1910.147(a)(1). Subsection (c) contains requirements for employers' lockout-tagout safety programs, including the documentation of procedures and the training of employees.[7] Subsection (d), in turn, specifies the sequence in which lockout or tagout control should be applied to a given machine: (1) preparing for shutdown; (2) shutting down the machine; (3) isolating the machine from its energy source; (4) affixing a lockout or tagout device; (5) dealing with stored or residual energy while the machine is locked or tagged out; and (6) verifying the machine is locked or tagged out.

---

[7] This is the subsection on which the violation rejected by the ALJ was based.

The ALJ penalized Southern Hens for (4), because a lockout device was not affixed to the Tumbler at the time of Norman's injury but should have been.

The Secretary and Southern Hens agree that § 1910.147(d)(4) applies to the process of cleaning the Tumbler, that the standard was violated here, and that Norman was exposed to the violative condition. Their dispute focuses on whether Southern Hens had actual or constructive knowledge of the violation. The Secretary argued below and the ALJ agreed that Southern Hens had constructive knowledge. The ALJ found that, if Southern Hens were exercising reasonable diligence, it should have learned that Norman was not locking out the Tumbler while scrubbing the outside of the machine by hand. The ALJ noted that Norman cleaned the Tumbler the same way every night by the method a co-worker instructed her to follow and that Webb, her manager, had many chances to see her on his regular trips through the Tumbler area. The ALJ also observed that none of Southern Hens' training materials would have taught Norman specifically to lock out the Tumbler before scrubbing the outside. Finally, the ALJ rejected Southern Hens' suggestion that Norman's injury happened because she was distracted by personal problems. The ALJ found the evidence of her distraction, mostly statements she purportedly made immediately after her injury, "lack[ed] reliability" because the circumstances were "hectic" and Norman was going into shock. The ALJ also reasoned that, to the extent Norman was distracted in the moment, "this is exactly the type of hazard from which compliance with the lockout standard would have protected her."

The showing required to establish knowledge is of the physical conditions constituting the violation, not of the specific OSHA regulation or of the probable consequences of the violation. *E. Tex. Motor Freight, Inc. v. O.S.H.R.C.*, 671 F.2d 845, 849 (5th Cir. 1982) (per curiam). We have dealt with employer knowledge as a fact-specific, practical inquiry, looking to company

practice, the details of specific incidents, knowledge of supervisors imputable to the company, and commonsense inferences about what a company and its supervisors should know and do. *See, e.g.*, *Sanderson Farms*, 811 F.3d at 736–37; *MICA Corp. v. O.S.H.R.C.*, 295 F.3d 447, 450–51 (5th Cir. 2002) (per curiam); *Byrd Telcom, Inc. v. O.S.H.R.C.*, 657 F. App'x 312, 315–16 (5th Cir. 2016).

Substantial evidence supports the ALJ's determination that Southern Hens had constructive knowledge. Matt Lee testified that it was company practice for new employees to receive equipment-specific training from employees already working in the same area. In keeping with that approach, Norman's training on the Tumbler was by way of another employee, whose only guidance was that she should lock out the Tumbler before climbing into its drum. Norman was never instructed to lock out the machine before scrubbing the outside, which was the phase of the cleaning process that led to her injury. Southern Hens does not rebut this point.

Other unrebutted testimony by Norman substantiates the ALJ's decision. Her supervisor, Webb, regularly passed by the Tumbler while she cleaned it. Also, on one occasion, Webb saw Norman foaming the outside of the machine and questioned why the machine was turned off. This phase of cleaning immediately preceded scrubbing the outside, so this shows Webb was in a position to observe Norman's work closely. Webb's proximity indicates that, had he been reasonably diligent, he should have noticed that Norman was scrubbing the outside of the machine without locking it out.

Southern Hens' arguments do not dislodge the substantial evidence supporting the ALJ's holding. Its references to general safety rules and lockout training fail to persuade, because none specifically addressed the Tumbler. It is insignificant that the company's written procedures were held to comply with 29 C.F.R. § 1910.147(c)(4), because these procedures said nothing about

when to lock out the Tumbler during cleaning. It is also insignificant that OSHA did not cite Southern Hens for failure to train Norman. Under Commission precedent, "failure to issue a citation does not establish that the Secretary considers the employer to be in compliance." *Safeway Store No. 914*, 16 BNA OSHC 1504 (No. 91-373, 1993), 1993 WL 522458, at *5.

Finally, there is Southern Hens' suggestion that Norman was distracted by personal problems on the day in question.[8] To ascribe any significance to Norman's possible distraction, one would have to think that Southern Hens' general rules and training were adequate, such that an employee in an unperturbed state of mind could have done her work safely. The ALJ concluded that the fact of Norman's distraction was not established and that the company's general safety rules were not exculpatory, for the sound reasons already discussed.

There is a deeper problem with giving weight to Norman's distraction. Occupational safety regulations exist because people are distractible. Functioning with less than perfect focus and control is our ordinary condition. OSHA standards serve to protect workers from "common human errors such as 'neglect, distraction, inattention or inadvertence.'" *Matsu Ala., Inc.*, 25 BNA OSHC 1952 (No. 13-1713, 2015) (ALJ), 2015 WL 6941348, at *21 (quoting *Slyter Chair, Inc.*, 4 BNA OSHC 1110, 1112 (No. 1263, 1976)). The standards "implicitly recognize[] that human characteristics such as skill, intelligence, carelessness, and fatigue, along with many other qualities play a part in an individual's job performance." *Id.* (quoting *B.C. Crocker*, 4 BNA OSHC 1775,

---

[8] The Secretary has no argument on this point, because Southern Hens did not really advance it as an argument until its reply brief. "Ordinarily, arguments raised for the first time in a reply brief are waived." *See Flex Frac Logistics, L.L.C. v. N.L.R.B.*, 746 F.3d 205, 208 (5th Cir. 2014). But the issue appeared in Southern Hens' initial statement of fact, and so we address it for the sake of thoroughness.

1777 (No. 4387, 1976)). Thus, to note our weaknesses and vulnerabilities, as Southern Hens does of Norman, is to make the case for enforcing occupational safety regulations.

That said, we do excuse employers from liability when they establish the affirmative defense of "unpreventable employee misconduct" (UEM), which Southern Hens asserts here. The employer must show that it "1) has established work rules designed to prevent the violation, 2) has adequately communicated these rules to its employees, 3) has taken steps to discover violations, and 4) has effectively enforced the rules when violations have been discovered." *W.G. Yates & Sons*, 459 F.3d at 609 n.7. The UEM defense is not expressly stated in any statute or regulation. Rather, it stems from the scope of the Act's prohibitions, which reach only those harms that are preventable.[9] Consequently, the UEM inquiry often overlaps considerably with the main violation inquiry. *See, e.g.*, *N. Dall. Acrylic & Stucco, Inc.*, 51 F. App'x 930 (5th Cir. 2002) (per curiam). Much that has already been said will be relevant again.

The ALJ rejected the UEM defense because Southern Hens did not have an established work rule that, if followed, would have prevented Norman's injury. The ALJ considered Southern Hens' rule to "Keep hands off moving machinery" inapposite, reasoning that the violation was the failure to lock out the Tumbler, so a rule against placing one's hand on moving machinery would not have prevented it. The ALJ rejected the company's written procedures, training materials, and other safety rules because, as already noted, none said when to lock out the Tumbler for cleaning. For similar reasons, the ALJ rejected the idea that Southern Hens had adequately communicated proper

---

[9] Given the less-specific source of the UEM defense, unsurprisingly circuit courts have devised varying formulations. *See N.Y. State Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98, 106–07 (2nd Cir. 1996) (comparing cases).

safety rules to Norman. With Southern Hens failing on the first two elements of the UEM defense, the ALJ did not expressly consider the third and fourth elements.

Southern Hens insists it did have an established work rule qualifying it for the UEM defense. Southern Hens appears to mean the combination of its written procedure for locking out the Tumbler and its general "hands off" rule for moving machinery. Southern Hens' argument is that Norman should have put two and two together: "If [Norman] had followed the rule to not put her hands on the moving tumbler, but still needed to complete her job of cleaning the tumbler, she would necessarily have to lock out the machine."

Substantial evidence again supports the ALJ's determination, and Southern Hens' arguments fail. Under Commission precedent, a work rule is "an employer directive that requires or prescribes certain conduct," rather than a general hortatory statement. *J.K. Butler Builders, Inc.*, 5 BNA OSHC 1075 (No. 12354, 1977), 1977 WL 35868, at *2 (rejecting guidance to avoid "unsafe areas" as an established work rule); *see also S & G Packaging Co.*, 19 BNA OSHC 1503 (No. 98-1107, 2001), 2001 WL 881250, at *4 (rejecting "Keep hands and feet away from moving machinery" and "Do not put your hands in any piece of moving machinery"). We have likewise insisted on work rules that specifically match the violation at issue. *See Byrd Telcom,* 657 F. App'x at 316. Southern Hens' general "hands off" rule does not suffice.

Moreover, in relying on its "hands off" rule, Southern Hens mistakes the nature of the violation. The departure from OSHA standards, not the worker's injury, is the violation. *See Calpine Corp. v. O.S.H.R.C.*, --- F. App'x ----, 2019 WL 2387637, at *5 (5th Cir. June 5, 2019) (per curiam); *Sanderson Farms, Inc. v. O.S.H.R.C.*, 348 F. App'x 53, 57 (5th Cir. 2009) (per curiam). The lack of a lockout device on the Tumbler was the violation here. That Norman might have

avoided injury by keeping her hands off the machine—never mind that her job was to scrub it by hand—does not negate the violation.[10]

Because Southern Hens lacked the sort of established work rule required for the UEM defense, we uphold the ALJ as to the lockout violation.

B

The ALJ also penalized Southern Hens for violating the machine-guarding standard at 29 C.F.R. § 1910.212(a)(1), which provides that "[o]ne or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks." If "handtools for placing and removing material" are used, they "shall be such as to permit easy handling of material without the operator placing a hand in the danger zone." *Id.* § 1910.212(a)(3)(iii). "Such tools shall not be in lieu of other guarding required by this section, but can only be used to supplement protection provided." *Id.*

The ALJ found that the standard was violated because the conveyor at issue had an "ingoing nip point" with "no physical guard covering it." She cited Commission precedent holding that the standard requires physical guarding of hazards. *See B.C. Crocker*, 1976 WL 6125, at *2. She therefore rejected Southern Hens' argument that the provision of a handheld tool avoided a violation.

The ALJ also found that employees were exposed to the hazard. She applied the following standard for exposure from the Commission's *Fabricated Metal Products* decision:

---

[10] OSHA violations can occur without any employee injury, because "safety regulations are preventative, not reactionary and the absence of injury is not evidence of the absence of danger." *Sanderson Farms*, 811 F.3d at 737.

> [I]n order for the Secretary to establish employee exposure to a hazard she must show that it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger. We emphasize that . . . the inquiry is not simply into whether exposure is theoretically possible. Rather, the question is whether employee entry into the danger zone is reasonably predictable.

*Fabricated Metal Prods. Inc.*, 18 BNA OSHC 1072 (No. 93-1853, 1997), 1997 WL 694096, at \*3 (footnotes omitted). The ALJ found that employees were in the "zone of danger" based on Young's testimony that he saw Dmitri Hunt's hand within an inch or two of the nip point. She found this reasonably predictable because, as Southern Hens knew, jams occurred frequently and it was Hunt's role to clear them. She rejected Southern Hens' argument that its provision of the hand tool avoided employee exposure because an employee's hands, while using the tool, would still be "in proximity" to the ingoing nip point.

The ALJ also found that Southern Hens had constructive knowledge of the violation. The lack of a physical guard on the conveyor could be easily observed by anyone passing by, all the more so because the adjoining, identical conveyor had such a guard. She noted Scott French's recognition of jamming problems, which Young related in his testimony. The ALJ also pointed out that provision of a tool implies recognition of the risk inherent when the work is not done with a tool. Finally, the ALJ deemed this a serious violation because the ingoing nip point was "large enough for an employee's finger" and, if one were drawn in by the conveyor's movement, "such an event could result in amputation."

Substantial evidence supports these determinations, and Southern Hens' arguments against them fail. Southern Hens argues that there was no violation here because employees were not exposed to a hazard. The company says that, under Commission precedent, the exposure inquiry should be done

with reference to "the manner in which the machine functions and the way it is operated," emphasizing this last clause.[11] Because Southern Hens furnished Hunt a tool to clear jams from the conveyor, the company contends that the conveyor operated in a way that did not actually expose him or other employees to harm. It points to the ALJ's statement that use of the tool made the likelihood of injury more "remote."

Along similar lines, Southern Hens appears to contend that no violative condition was even present, arguing that OSHA rules permit "guarding by distance" and provision of the hand tool was a permissible use of that strategy. It cites an OSHA guidance document saying that machines into which product is fed "can be safeguarded by distance if the operators maintain a safe distance between their hands and the point of operation." *See* Occupational Safety & Health Admin., *Safeguarding Equipment and Protecting Workers from Amputations*, OSHA 3170 (2001).[12] As to knowledge, Southern Hens argues that Hunt was trained to use the hand tool. Because Hunt knew to use the tool and knew not to use his hands, it could not be said that Southern Hens had constructive knowledge of the violation.

Southern Hens' arguments blur the lines between the standard's requirements and the degree of exposure its employees must face for a violation to occur. As the ALJ said, the Commission has long held that § 1910.212 "requires physical guarding." *See B.C. Crocker*, 1976 WL 6125, at *2. It permits "guarding by distance" only when physical guards or barriers are infeasible. *TMD Staffing*, 2018 CCH OSHD ¶ 33,676 (No. 17-0560, 2018), 2018 WL 3695715, at *9 ("[S]afeguarding by maintaining a safe distance from the point

---

[11] *See Lewis County Dairy Corp.*, No. 03-1533 (OSHRC Aug. 14, 2006), 2006 WL 3247249, at *5.

[12] *Accessible at* https://www.osha.gov/Publications/OSHA3170/osha3170.html.

of operation may be acceptable but **only** when safeguarding by physical barrier or physical devices **is not feasible**.") (emphasis in original). Southern Hens has not shown a physical guard would be infeasible; it could not, given the presence of a guard on the parallel conveyor.

Southern Hens' best authority to the contrary is the OSHA guidance document cited above, but it is not much help. The guidance expresses only qualified approval of guarding by distance: "Operators can use tools to feed work pieces into equipment to keep their hands away from the point of operation, but this should be done only in conjunction with the guards and devices described previously." Occupational Safety & Health Admin., *Safeguarding Equipment*. Also significant is the text of the standard itself, which provides that hand tools, if used, must "permit easy handling of material without the operator placing a hand in the danger zone" and "shall not be in lieu of other guarding required by this section, but can only be used to supplement protection provided." 29 C.F.R. § 1910.212(a)(3)(iii). Southern Hens' provision of the tool to Hunt satisfied neither condition. Consequently, Southern Hens fails to disturb the ALJ's finding of non-compliance with the standard.

As to exposure, a threshold question is the degree required to sustain a violation. We have not yet endorsed the "reasonably predictable" standard from the Commission's *Fabricated Metal Products* decision,[13] but other circuit courts have. *See, e.g.*, *R. Williams Constr. Co. v. O.S.H.R.C.*, 464 F.3d 1060, 1064 (9th Cir. 2006); *Amer. Wrecking Corp. v. Sec'y of Labor*, 364 F.3d 321, 327 (D.C. Cir. 2004) (per curiam); *N&N Contractors, Inc. v. O.S.H.R.C.*, 255 F.3d

---

[13] An unpublished decision in 2011 considered it *arguendo* but did not affirm that it is the correct standard for exposure. *See Turner Indus. Grp., L.L.P. v. O.S.H.R.C.*, 413 F. App'x 690, 693–94 (5th Cir. 2011) (per curiam).

122, 127 (4th Cir. 2001). Southern Hens does not contest that the standard applies, nor does it propose an alternative. Because it is of long standing,[14] endorsed by other courts, and not rivaled by an alternative, we adopt it now.

To recall the standard, the Secretary must show "it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger." *Fabricated Metal Prods.*, 1997 WL 694096, at *3. The record shows "operational necessity": jams frequently occurred on the conveyor; it was Hunt's job to clear them; and the tool he was given was too heavy to use for all jams. The consequence of this operational necessity was, as Young observed, Hunt's fingers getting within an inch or two of a nip point. This is substantial evidence that employee injury from the hazard is reasonably predictable. Southern Hens' call to focus on "the manner in which the machine functions and the way it is operated" only bolsters the ALJ's determination. The machine's frequent jams were the underlying cause of this hazard. Likewise, Southern Hens' provision of a tool does not eliminate employee exposure if the nature of the tool and the frequency of jams combine to render use of the tool impractical.

The issue of knowledge is straightforward. One glance at the machine would reveal it had no physical guard, and one glance at the adjoining machine would show the feasibility of installing one. Thus, even with minimal diligence, Southern Hens should have known of the violation. This suffices for

---

[14] *Fabricated Metal Products* was not a novelty, but rather a synthesis of "seminal" Commission precedent. 1997 WL 694096 at *2; *see Rockwell Int'l Corp.*, 9 BNA OSHC 1092 (No. 12470, 1980), 1980 WL 10706, at *6 (focusing on "the manner in which the machine functions and how it is operated by the employees"), *abrogated on other grounds by George C. Christopher & Sons, Inc.*, 10 BNA OSHC 1436 (No. 76-647, 1982); *Gilles & Cotting, Inc.*, 3 BNA OSHC 2002 (No. 504, 1976), 1976 WL 5933, at *2 (adopting a "rule of access based on reasonable predictability").

constructive knowledge. Southern Hens misses the mark by arguing that there was no history of injuries on the machine. As noted, the requisite knowledge is only of the physical conditions constituting the violation. *See Sanderson Farms*, 811 F.3d at 735–36; *E. Tex. Motor Freight*, 671 F.2d at 849. The lack of injury history does not change the readily evident fact that a machine with a nip point lacked a physical guard.

Finally, there is the ALJ's decision to deem the violation "serious." "A serious violation exists 'if there is a substantial probability that death or serious physical harm could result from [the] condition[s].'" *Sanderson Farms*, 811 F.3d at 737 (quoting 29 U.S.C. § 666(k)). This standard may be separated into two probabilistic questions: the possibility of an injury and, if an injury occurs, the likelihood it is serious or lethal. *See E. Tex. Motor Freight*, 671 F.2d at 849 ("A violation may be determined to be serious where, although the accident itself is merely possible . . . there is a substantial probability of serious injury if it does occur."(quotation omitted)).

Southern Hens' lack of injury history on the conveyor bears on the first of these, but the threshold—mere possibility—is low. Eyewitness observation of an employee's hand being within an inch or two of a nip point is enough to establish that.

Southern Hens also relies on a Commission decision rejecting a compliance officer's recommendation of a serious violation. *See Dorman Prods., Inc.*, 1979 CCH OSHD ¶ 23,508 (No. 78-3009, 1979) (ALJ), 1979 WL 7927. The case concerned a "box-setting machine" that used a plunger to form cardboard into shipping boxes. *Id.* at *1. No guard protected employees from the plunger, and several had gotten hands "trapped" while clearing jams or doing maintenance. *Id.* at *2. The Commission found no serious violation because there was "no significant resulting injury, no medical attention required, and no lost time from work." *Id.* It credited the company with an "exemplary" safety

21

program and observed there were no employee complaints. *Id.* at \*2. The Commission then let the company go without a penalty. *Id.* at \*4.

The facts of *Dorman Products* made it quite reasonable for the Commission to reject a serious violation, but the facts here are dissimilar. This citation of Southern Hens is preventive. No employee has yet gotten trapped in the nip point, so the likely severity of an injury, if one were to occur, may be debated. In *Dorman Products*, by contrast, several employees' hands were trapped, but they suffered no injury. Southern Hens has no such evidence at its disposal. Moreover, given the other violation in this case, Southern Hens cannot be credited with the "exemplary" safety program that aided the company's case in *Dorman Products*.

Though Southern Hens' arguments are unpersuasive, the ALJ must still have reasonably found a substantial probability that an injury would be serious. We have construed "serious" injury to include broken bones, crushed toes, and chemical burns. *See Sanderson Farms*, 811 F.3d at 737 (bones); *Albemarle Corp. v. Herman*, 221 F.3d 782, 787 (5th Cir. 2000) (burns); *E. Tex. Motor Freight*, 671 F.2d at 849 (toes). More generally, we have said that "[w]hen human life or limb is at stake, any violation of a regulation is 'serious'." *Everglades Sugar Refinery, Inc. v. Donovan*, 658 F.2d 1076, 1082 (5th Cir. Unit B Oct. 1981) (quotation omitted). The ALJ looked to the risk of amputation here, which was based on Young's opinion testimony. While this may not be the strongest evidence, Southern Hens had no rebuttal evidence. Because OSHA regulations err on the side of prevention, and because the substantial-evidence standard of judicial review is deferential, we uphold the ALJ's determination.

C

The ALJ penalized Southern Hens $7,000 for the lockout violation and $5,000 for the machine-guarding violation. She based these penalty amounts

on the factors enumerated in 29 U.S.C. § 666(j): "the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the history of previous violations."[15]

Southern Hens' challenge to the penalties is based not on the ALJ's consideration of the § 666(j) factors, but on the theory that the ALJ impermissibly considered penalty sums exceeding the statutory maximum. Southern Hens points to § 666(b), under which penalties for serious violations are capped at $7,000. The actual penalties here did not exceed this cap, but the Secretary requested penalties for the two violations of $12,471 and $6,663. Southern Hens' theory appears to be that the Secretary's request impermissibly tainted the ALJ's deliberations, even though the result was within the statute's limits.

As the Secretary correctly observes, the statutory caps have been increased pursuant to the Federal Civil Penalties Inflation Adjustment Act. When the Act was passed originally in 1990, it exempted OSHA, but Congress eliminated the exemption in 2015. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat. 584, 599 (2015). OSHA is now obligated to adjust its civil penalties by regulation, which the Secretary did in 2016, setting the maximum penalty at $12,471. *See* 81 Fed. Reg. 43,430, 43,439 (June 24, 2016). That is precisely the penalty that the Secretary requested for Southern Hens' lockout violation, and its request therefore was lawful.

---

[15] The ALJ credited Southern Hens with promptly reporting Norman's injury and with a lack of injury history on the conveyor, and she noted it was not a particularly large company. She found that the severity of Norman's injury, the likely severity of an injury from the conveyor's nip point, and Southern Hens' decision to discipline Norman rather than accept responsibility weighed in favor of a larger penalty. She made the penalty for the lockout violation larger because of the two documented injuries on the Tumbler, whereas the conveyor lacked a history of injuries and the possibility of injury appeared more remote.

No. 18-60436

Southern Hens argues that the specific should trump the general, so the $7,000 figure in § 666(b) should remain the statutory maximum. Southern Hens cites no authority for the proposition that Congress must directly amend the penalty amount in every single statute, rather than employing the approach to inflation adjustment it took here. Even if such authority were shown, it would not do away with the problem, already noted, that the ALJ's penalty was within the unadjusted limit of § 666(b).

Accordingly, Southern Hens' challenge to the ALJ's penalty determination fails. We therefore uphold the penalties.[16]

V

For the foregoing reasons, the petition for review is DENIED.

---

[16] Southern Hens made no challenge to the ALJ's consideration of statutory factors, but had it done so, we would review for abuse of discretion. *Chao v. O.S.H.R.C.*, 401 F.3d 355, 376 (5th Cir. 2005). Such a challenge would be similarly unavailing. The ALJ's consideration of the § 666(j) factors was reasonable, evenhanded, and thus worthy of affirmance.