# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 9, 2020

Lyle W. Cayce
Clerk

No. 19-60592

SANDERSON FARMS, INCORPORATED (PRODUCTION DIVISION),

Petitioner

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION,

Respondent

Petition for Review of an Order of the
Occupational Safety and Health Review Commission

Before WIENER, ENGELHARDT, and OLDHAM, Circuit Judges.

WIENER, Circuit Judge:

Petitioner Sanderson Farms, Inc. ("Sanderson") petitions for review of a determination by the Occupational Safety and Health Review Commission (the "Commission") that it violated various regulations of the Department of Labor's Occupational Safety and Health Administration ("OSHA"). We find no error, so we deny Sanderson's petition.

## I. Background

The Secretary of Labor ("Secretary") is charged by statute "with responsibility for setting and enforcing workplace health and safety standards" and has delegated that power to OSHA. *Martin v. OSHRC*, 499 U.S. 144, 147 (1991); Delegation of Authority and Assignment of Responsibility to the

No. 19-60592

Assistant Secretary for Occupational Safety and Health, 77 Fed. Reg. 3912 (Jan. 25, 2012). Sanderson operates a chicken-processing plant in Waco, Texas that uses anhydrous ammonia as a refrigerant to freeze the processed chickens. In 2017, OSHA issued document requests to Sanderson and conducted inspections of its plant to check for compliance with OSHA's Process Safety Management of Highly Hazardous Chemicals ("PSM") standard, 29 C.F.R. § 1910.119. The PSM standard "contains requirements for preventing or minimizing the consequences of catastrophic releases of toxic, reactive, flammable, or explosive chemicals," expressly including anhydrous ammonia. 29 C.F.R. § 1910.119, Purpose. The PSM standard applies to Sanderson's plant because Sanderson uses more than ten thousand pounds of ammonia. *See* 29 C.F.R. § 1910.119, App'x A.

The Secretary issued Sanderson a citation charging six violations of the PSM standard. Two items from that citation are at issue in this petition: (1) Item 5a, which charges that Sanderson did not "establish and implement written procedures to maintain the on-going mechanical integrity of the process" with respect to safety cutouts, emergency stop testing procedures, and pressure vessel level control test procedures, in violation of 29 C.F.R. § 1910.119(j)(2); and (2) Item 5b, which charges that Sanderson "failed to perform inspections and tests on process equipment" including three compressor cutouts and two emergency stop buttons, in violation of 29 C.F.R. § 1910.119(j)(4)(i).

Both of the allegedly violated regulations are found in the section of the PSM standard that requires an employer to implement a mechanical integrity program, 29 C.F.R. § 1910.119(j). That section "contain[s] requirements for maintaining the mechanical integrity of process equipment in order to assure that such equipment is designed, installed, and operates properly," with the ultimate goal of "ensur[ing] that highly hazardous chemicals covered by the

No. 19-60592

standard are contained within the process and not released in an uncontrolled manner." Process Safety Management of Highly Hazardous Chemicals; Explosives and Blasting Agents, 57 Fed. Reg. 6356, 6388–89 (Feb. 24, 1992) (codified at 29 C.F.R. pt. 1910).

The safety cutouts of Item 5a and compressor cutouts of Item 5b refer to the same equipment, viz., devices that shut down ammonia compressors when monitored conditions—temperature, pressure, or oil pressure—fall outside of allowable limits. The emergency stops referred to in Items 5a and 5b are buttons inside and outside of the ammonia machinery room that, when pressed, shut down the flow of ammonia to respond to a release. The pressure vessel level control mentioned in Item 5a ensures that the level of ammonia in the pressure vessel stays low enough to avoid overflowing.

Sanderson contested the citation. The Secretary withdrew several citation items in May 2018, and an Administrative Law Judge ("ALJ") held a hearing on the remaining items in August 2018. The ALJ affirmed Item 5a in its entirety and Item 5b with respect to the compressor cutouts and emergency stops. The ALJ vacated all other parts of the citation. Sanderson petitioned the Commission for discretionary review of the ALJ's decision. When the Commission declined to direct the case for review, the ALJ's order became the final order of the Commission on July 1, 2019. *See* 29 U.S.C. § 661; 29 C.F.R. § 2200.90(d) (2005). Sanderson now petitions this court for review of the Commission's order.

## II. Jurisdiction and Standard of Review

We have jurisdiction over this petition under 29 U.S.C. § 660. "Though the ALJ's order became final only when the Commission declined to conduct discretionary review, we apply the same standard of review to the final decision here as we would if the Commission had directly issued its own decision." *Excel Modular Scaffold & Leasing Co. v. OSHRC*, 943 F.3d 748, 753

No. 19-60592

(5th Cir. 2019). We must affirm the ALJ's findings of fact "if they are supported by substantial evidence on the record considered as a whole even if this court could justifiably reach a different result de novo." *MICA Corp. v. OSHRC*, 295 F.3d 447, 449 (5th Cir. 2002) (quoting *Trinity Marine Nashville, Inc. v. OSHRC*, 275 F.3d 423, 426–27 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Excel Modular Scaffold & Leasing Co.*, 943 F.3d at 753 (quoting *Chao v. OSHRC*, 401 F.3d 355, 362 (5th Cir. 2005)). We may only overturn the ALJ's legal conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *Trinity Marine Nashville, Inc.*, 275 F.3d at 427.

## III.  Analysis

Generally, the Secretary has the burden of proving "(1) that the cited standard applies; (2) noncompliance with the cited standard; (3) access or exposure to the violative conditions; and (4) that the employer had actual or constructive knowledge of the conditions through the exercise of reasonable due diligence." *Sanderson Farms, Inc. v. Perez*, 811 F.3d 730, 735 (5th Cir. 2016). Sanderson contends that various parts of the citation should be vacated because: (1) The standards do not apply to the equipment referenced in the citation, (2) any violation of the standards did not create a hazard and did not expose employees to a hazard, (3) Sanderson did not violate the standards, and (4) Sanderson could not reasonably have had knowledge of any violative condition.

### A. Whether the Mechanical Integrity Program Applies to the Equipment Cited in Items 5a and 5b

Sanderson contends that the standards cited in Items 5a and 5b— § 1910.119(j)(2) and § 1910.119(j)(4)(i), respectively—do not apply to the compressor cutouts and emergency stops referenced in Items 5a and 5b

4

because that equipment does not fall within the scope of the mechanical integrity program as defined by § 1910.119(j)(1). Sanderson does not contest that the pressure vessel level control is included. Section (j)(1) states: "(1) Application. Paragraphs (j)(2) through (j)(6) of this section apply to the following process equipment: . . . (iv) Emergency shutdown systems; [and] (v) Controls (including monitoring devices and sensors, alarms, and interlocks) . . . ." 29 C.F.R. § 1910.119(j)(1).

As for the compressor cutouts, Sanderson does not dispute that: (a) The compressors or their cutouts are "process equipment" as referred to in the opening part of section (j)(1)—that is, equipment "associated with" "any activity involving a highly hazardous chemical including any . . . handling . . . of such chemicals"—or (b) that the cutouts are "[c]ontrols" as specified in subsection (v). *See* 29 C.F.R. § 1910.119(b); Process Safety Management, 57 Fed. Reg. at 6389. That should end the inquiry.

Instead, Sanderson contends that because compressors are not included in subsection (j)(1), neither are their component parts, thus excluding the compressor cutouts. There is no support in the text of section (j)(1) for this interpretation. The text contains only two necessary qualifications: (1) that the equipment be process equipment, and (2) that the equipment's type be one of those enumerated. The first requirement removes any possibility of a runaway regulation engulfing all interlocks in the entire plant. *See* Process Safety Management, 57 Fed. Reg. at 6389 ("Paragraph (j)(1) is intended to cover only that equipment associated with a process that is covered by this standard."). The ALJ's determination that the compressor cutouts are subject to the mechanical integrity program as delineated by subsection (j)(1) was, therefore, not an abuse of discretion or otherwise contrary to law.

As for the emergency stops, Sanderson argues that they are not included in the mechanical integrity program because (1) Sanderson's witness testified

that they are not emergency shutdown systems, (2) they are "not designed to protect the mechanical integrity of the equipment by preventing a release," and (3) they would only be activated after some other mechanical failure that led to a release. These arguments are unavailing. First, there is nothing in the text of the regulation that limits the application of the mechanical integrity program to equipment intended to *prevent* a release. *See* 29 C.F.R. § 1910.119(j). The requirements of section (j) apply to the categories of equipment listed in subsection (j)(1) as long as they are process equipment.

Second, in arguing for a distinction between equipment that acts before or after a release, Sanderson misconstrues the purpose of the regulation. The purpose of the overall PSM standard is "preventing *or minimizing* the consequences of catastrophic releases." 29 C.F.R. § 1910.119, Purpose (emphasis added). Emergency stops activated after a release can certainly minimize the consequence of that release. *See Delek Ref., Ltd. v. OSHRC*, 845 F.3d 170, 183 (5th Cir. 2016) (rejecting the same argument as to equipment that prevented the flow of released hazardous chemicals into a control room). The mechanical integrity program's purpose is to "assure that" "equipment [that] could have a significant impact on the safety of a process" "is designed, installed, and operates properly." Process Safety Management, 57 Fed. Reg. at 6388. Emergency shutdown systems are not necessarily included in the mechanical integrity program because they protect the mechanical integrity of other equipment, but because they are themselves "equipment [that] could have a significant impact on the safety of a process" as listed in section (j)(1). Process Safety Management, 57 Fed. Reg. at 6388.

Third, Sanderson misrepresents the witness's testimony. After several questions about how emergency stops act only after a release, the witness was asked whether the emergency stops are "an emergency shutdown system designed to prevent a release." Whether equipment is an "emergency shutdown

system intended to prevent a release," however, is irrelevant to whether that equipment is included in section (j)(1) because, as explained above, there is no requirement in section (j)(1) limiting its application to equipment intended to prevent a release. The Secretary's witness testified that the emergency stops are emergency shutdown systems, and Sanderson points to no evidence before the ALJ suggesting otherwise. The ALJ's determination that the emergency stops are subject to the mechanical integrity program was also, therefore, not an abuse of discretion or otherwise contrary to law.

B. Whether Any Violations Exposed Workers to a Hazard

Sanderson claims that Items 5a and 5b should be vacated because any violation did not expose employees to a hazard. Sanderson insists that the failure of the cited equipment would not cause a release and that even if it caused increased pressure in the ammonia system, that pressure would be harmlessly relieved by other safety devices.

"Since OSHA is required to determine that there is a hazard before issuing a standard, the Secretary is not ordinarily required to prove the existence of a hazard each time a standard is enforced." *Sanderson Farms, Inc.*, 811 F.3d at 735. A "general standard [that] incorporates a hazard as a violative element" is the exception to this rule. *Bunge Corp. v. Sec'y of Labor*, 638 F.2d 831, 834 (5th Cir. Unit A Mar. 1981); *see also, e.g.*, *S & H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273, 1282 (5th Cir. Unit B Oct. 1981) (holding that the standard requiring "appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions" required proof of a hazard). Neither § 1910.119(j)(2) nor § 1910.119(j)(4), however, apply only when there is a hazardous condition. Subsection (j)(2) states that "[t]he employer shall establish and implement written procedures to maintain the on-going integrity of process equipment," and subsection (j)(4)(i) states, "Inspections and tests shall be performed on process equipment." 29 C.F.R.

§§ 1910.119(j)(2), (j)(4)(i). Both standards are of the ordinary sort for which a hazard is presumed.

Sanderson's evidence that there are other devices in the process intended to prevent or mitigate a release of ammonia or that the failure of a particular piece of equipment would not cause a release on its own is not dispositive as to whether a violation exposed employees to a hazard. The Secretary's witness testified that the failure of compressor cutouts, pressure vessel level controls, or emergency stops could lead to the release of, or the failure to mitigate the release of, ammonia and that a lack of written procedures and testing could lead to such failure. The ALJ's determination that Sanderson failed to rebut the presumption of exposure to a hazard was not an abuse of discretion or otherwise contrary to law.

C. Whether Sanderson Violated § 1910.119(j)(4)(i) by Failing to Test the Equipment Cited in Item 5b

Citation Item 5b charges Sanderson with failing to test compressor cutouts and emergency stops as required by the mechanical integrity program. The relevant provisions of the testing requirement found in § 1910.119(j)(4) read:

> (4) Inspection and testing.
>
> (i) Inspections and tests shall be performed on process equipment.
>
> (ii) Inspection and testing procedures shall follow recognized and generally accepted good engineering practices.
>
> (iii) The frequency of inspections and tests of process equipment shall be consistent with applicable manufacturers' recommendations and good engineering practices, and more frequently if determined to be necessary by prior operating experience.

29 C.F.R. § 1910.119(j)(4).

Sanderson contends that subsection (i) does not require it to perform inspections and tests on *all* process equipment, but rather only that equipment

for which recognized and generally accepted good engineering practices ("RAGAGEP") require inspection and testing. In Sanderson's view, the inclusion of subsections (ii) and (iii)—which require that inspection and testing procedures and frequency conform with or exceed RAGAGEP and manufacturer recommendations—into the inspection and testing requirement means that the overall inspection and testing requirement exists only within the scope of RAGAGEP. If that were the case, the Secretary would have the burden to show that RAGAGEP require the testing of the compressor cutouts and emergency stop buttons referenced in Item 5b, which was not done here.

But that interpretation is wrong. Considering the testing and inspection requirement of section (j)(4) as a whole, as we must do, *see John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 94 (1993), the regulation sets a minimum standard that process equipment must be inspected and tested, then gives employers the flexibility to implement that testing guided by RAGAGEP. First, the plain language of subsection (i) explicitly requires that process equipment be inspected and tested. 29 C.F.R. § 1910.119(j)(4)(i). If Sanderson's interpretation were correct, subsection (i) would instead read, "Inspections and tests [required by recognized and generally accepted good engineering practices] shall be performed on process equipment." *Id.* OSHA clearly knew how to incorporate RAGAGEP into a regulation: The remaining subsections of section (j)(4) do exactly that. The minimum requirement in subsection (i), that inspection and testing be performed on process equipment, however, does not include such a reference. A proper interpretation of the regulation gives meaning to that absence. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23

(1983))); *Goodman v. Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017) ("[T]he rules of statutory construction apply when interpreting an agency regulation.").

Second, under Sanderson's reading, subsection (i) is surplusage. If a requirement to follow RAGAGEP in testing *procedures* also dictates what equipment must be tested in the first place, there would be no need to separately require inspection and testing. Interpretations of statutes and regulations that avoid surplusage are favored. *See Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 106 (2011); *Delek Ref., Ltd.*, 845 F.3d at 177 ("Our precedents, however, have repeatedly cautioned against interpreting statutes in such a manner if at all possible."). The reading that gives effect to all parts of the section is that subsection (i) establishes a baseline requirement that process equipment be inspected and tested, and subsection (ii) allows an employer flexibility in how—but not whether—to perform that inspection and testing. This reading creates no surplusage: Even if there were pieces of process equipment for which RAGAGEP provide no specific guidance on inspection and testing, subpart (ii) would still require companies to apply RAGAGEP where they existed.

Third, contrary to what Sanderson argues, an independent requirement for inspection and testing is consistent with the overall purpose of the regulation. In the preamble to the final rule, OSHA states that the mechanical integrity program section, now § 1910.119(j), "contain[s] requirements for maintaining the mechanical integrity of process equipment in order to assure that such equipment is designed, installed, and operates properly." Process Safety Management, 57 Fed. Reg. at 6388. What is now subsection (i) "require[s] inspections and tests to be performed on specified process equipment because of the potential safety and health hazards that could result if the equipment malfunctioned." *Id.* at 6390. What is now subsection (ii), on

the other hand, serves "to make sure that process equipment is inspected and tested properly, and that the inspections and tests are performed in accordance with appropriate codes and standards." *Id.* The two subparts work together, balancing the competing interests of safety and efficiency by setting a minimum standard for inspection and testing of "equipment[] critical to process safety"—that is the equipment listed in subsection (j)(i)—then allowing employers flexibility to carry it out.[1] *Id.* at 6389. The mechanical integrity section is not merely an admonishment to maintain equipment wisely.

Neither does this interpretation put Sanderson in an impossible position, as it claims. Sanderson's expert conceded that it is possible to test the process equipment listed in Items 5a and 5b. And, although witnesses testified that there are risks associated with testing emergency stops, there is no evidence in the record that any industry or professional standards *prohibit* testing the compressor cutouts and emergency stop buttons referenced in Item 5b.[2] More

---

[1] The Process Safety Management Standard's nonmandatory Appendix C corroborates this approach as well. Regarding the mechanical integrity program, it advises:

> The first step of an effective mechanical integrity program is to compile and categorize a list of process equipment and instrumentation for inclusion in the program. This list would include pressure vessels, storage tanks, process piping, relief and vent systems, fire protection system components, emergency shutdown systems and alarms and interlocks and pumps. For the categorization of instrumentation and the listed equipment the employer would prioritize which pieces of equipment require closer scrutiny than others. Meantime to failure of various instrumentation and equipment parts would be known from the manufacturers data or the employer's experience with the parts, which would then influence the inspection and testing frequency and associated procedures. Also, applicable codes and standards . . . provide information to help establish an effective testing and inspection frequency, as well as appropriate methodologies.

29 C.F.R. § 1910.119, App'x C. The guidance says that the first step is to make a list of process equipment, including the specific types of equipment enumerated in subsection (j)(1). Appendix C makes no mention of an employer's judgment in deciding what equipment to put on the list. The following steps do ask the employer to exercise judgment and experience, but only to determine the frequency and procedures for inspection and testing.

[2] Even if there were such evidence, Sanderson is prohibited from asserting a "greater hazard" defense because it failed to include that affirmative defense in its answer. *See* 29

importantly, RAGAGEP—that is, recognized and generally accepted good engineering practices—are not a static reference manual. They are guidance for how to conduct the *practice* of engineering, which itself includes the development of new procedures and technology and the design of systems to achieve a goal. That compliance with an OSHA regulation requires some innovation does not make it absurd or unreasonable. *See B & B Insulation, Inc. v. OSHRC*, 583 F.2d 1364, 1372 n.13 (5th Cir. 1978) ("In the area of safety, . . . the Secretary is not restricted by the status quo. He may raise standards which require improvements in existing technologies or which require the development of new technology. . . ." (quoting *Society of Plastics Industry, Inc. v. OSHA*, 509 F.2d 1301, 1309 (2d Cir. 1975))).

In addition to arguing that the text of the regulation incorporates RAGAGEP, Sanderson also variously asserts that § 1910.119(j)(4)(i) is cabined by RAGAGEP because (a) the standard is a performance standard that requires the Secretary to prove that Sanderson acted unreasonably or contrary to industry practice, (b) Sanderson could not have known of the violative condition because it relied on industry practice and experts in not testing the equipment, and (c) applying the standard as does the Secretary violates Sanderson's right to fair notice.

Performance standards are those that "require an employer to identify the hazards peculiar to its own workplace and determine the steps necessary to abate them." *Thomas Indus. Coatings, Inc.*, 21 BNA OSHC 2283 (No. 97-1073, 2007). "Because performance standards . . . do not identify specific obligations, they are interpreted in light of what is reasonable." *Id.* Some sections of the PSM standard are performance standards, *see, e.g.*,

---

C.F.R. § 2200.34(b)(3), (4). Sanderson does not deny this. It instead argues that evidence of the risks posed by testing merely shows the lack of RAGAGEP specific to testing the cutouts and emergency stops of Items 5a and 5b.

§ 1910.119(e)(1) ("[T]he process hazard analysis shall be appropriate to the complexity of the process and shall identify, evaluate, and control the hazards involved in the process."), but § 1910.119(j)(4)(i) is not.

Sanderson cites to several instances of courts reading a reasonableness or industry practice requirement into an OSHA standard, but § 1910.119(j)(4)(i) does not have anything like the generality or open-endedness of the standards found in those cases. The standards in those cases required that "[t]he employer shall provide adequate washing facilities . . . where contaminants may be harmful to the employees,"[3] or "[t]he employer . . . require[] the wearing of appropriate personal protective equipment . . . where there is an exposure to hazardous conditions,"[4] or "[p]rotective equipment . . . shall be provided . . . wherever it is necessary by reason of hazards of processes or environment,"[5] or "[t]he employer shall instruct each employee in the recognition and avoidance of unsafe conditions . . . to control or eliminate any hazards,"[6] or "[o]ne or more methods of machine guarding shall be provided to

---

[3] "The employer shall provide adequate washing facilities for employees engaged in the application of paints, coating, herbicides, or insecticides, or in other operations where contaminants may be harmful to the employees. Such facilities shall be in near proximity to the worksite and shall be so equipped as to enable employees to remove such substances." *Thomas Indus. Coatings, Inc.*, 21 BNA OSHC 2283 (No. 97-1073, 2007) (quoting 29 C.F.R. § 1926.51(f)(1)).

[4] "The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions [or] where this part indicates the need for using such equipment to reduce the hazards to the employees." *S & H Riggers & Erectors, Inc.*, 659 F.2d at 1275 n.1 (quoting 29 C.F.R. § 1926.28(a); *B & B Insulation, Inc.*, 583 F.2d at 1368) (same).

[5] "Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact." *Cotter & Co. v. OSHRC*, 598 F.2d 911, 912 n.1 (5th Cir. 1979) (quoting 29 C.F.R. § 1910.132(a))

[6] "The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or

protect the operator and other employees in the machine area from hazards,"[7] or "the employer [shall] establish and follow a program of . . . inspections . . . to ensure that all . . . parts . . . are in a safe operating condition and adjustment."[8] All but one of those standards apply when there is an undefined "hazard," necessitating the application of reasonableness or industry practice to determine what "hazard" means and therefore when the standards apply. The last requires an employer to make inspections to "ensure . . . a safe operating condition." 29 C.F.R. § 1910.217(e)(1)(i). Two aspects of that standard make it a performance standard: (1) It establishes an end result that the employer chooses how to work toward, and (2) "safe operating condition" is so general as to require definition by reference to industry standards for the regulation to be reasonable. *See Siemens Energy & Automation Inc.*, 20 BNA OSHC 2196 (No. 00-1052, 2005).

Section 1910.119(j)(4)(i), on the other hand, does not set a goal for an employer to meet with flexible methods; it prescribes that inspections and testing must happen. Neither does § 1910.119(j)(4)(i) apply only in the presence of a hazard, as other performance standards do. Instead, it applies to all equipment included in the mechanical integrity program. It is not, therefore, a performance standard defined in reference to industry practice.

---

eliminate any hazards or other exposure to illness or injury." *W.G. Fairfield Co.*, 19 BNA OSHC 1233 (No. 99-0344, 2000) (quoting 29 C.F.R. § 1926.21(b)(2)).

[7] "One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are—barrier guards, two-hand tripping devices, electronic safety devices, etc." *Martin v. Miami Indus., Inc.*, 983 F.2d 1067 (6th Cir. 1992) (quoting 29 C.F.R. § 1910.212(a)(1)).

[8] "It shall be the responsibility of the employer to establish and follow a program of periodic and regular inspections of his power presses to ensure that all their parts, auxiliary equipment, and safeguards are in a safe operating condition and adjustment." *Siemens Energy & Automation Inc.*, 20 BNA OSHC 2196 (No. 00-1052, 2005) (quoting 29 C.F.R. § 1910.217(e)(1)(i)).

The requirement for "inspections and tests" on process equipment is explicit and unambiguous, and therefore satisfies the reasonableness requirement of due process and fair notice on its own. *See Corbesco, Inc. v. Dole*, 926 F.2d 422, 427 (5th Cir. 1991).

As to Sanderson's knowledge, "the Secretary must show that the employer knew of, or with exercise of reasonable diligence could have known of the non-complying condition." *Trinity Indus., Inc. v. OSHRC*, 206 F.3d 539, 542 (5th Cir. 2000). The Secretary need not prove that Sanderson understood that it was violating § 1910.119(j)(4)(i), but rather only "awareness of the physical conditions constituting the violation." *Calpine Corp. v. OSHRC*, 774 F. App'x 879, 884 (5th Cir. 2019) (unpublished) (quoting *Sec'y of Labor v. Phoenix Roofing, Inc.*, 17 BNA OSHC 1076 (No. 90-2148, 1995), *aff'd sub nom. Phoenix Roofing, Inc. v. OSHRC*, 79 F.3d 1146 (5th Cir. 1996) (unpublished table decision)). There is no dispute that Sanderson knew it did not test the equipment cited in Item 5b, so that element of the Secretary's burden is met.

D. Whether Sanderson Violated § 1910.119(j)(2) by Failing to Maintain Written Procedures for Inspecting and Testing the Equipment Cited in Item 5a

Citation Item 5a charges that Sanderson "did not establish and implement written procedures to maintain the on-going mechanical integrity of the process" with respect to "[s]afety cutouts," emergency stop testing procedures, and the "[l]evel control pressure vessel test procedure." The applicable standard in § 1910.119(j)(2) states, "Written procedures. The employer shall establish and implement written procedures to maintain the on-going integrity of process equipment." 29 C.F.R. § 1910.119(j)(2).

Sanderson points to several documents that it says constitute its written procedures to maintain the ongoing integrity of process equipment: (1) an overview document describing Sanderson's mechanical integrity program, (2) a schedule for inspection and maintenance, (3) examples of daily "refrigeration

check sheet[s]," (4) examples of monthly "Inspection List[s]" and "Check List[s]," and (5) examples of annual inspection forms.

The overview document states the following under the heading "Maintenance Procedures":

> Written Maintenance Procedures (attached in Volume III Standard Operating Procedures) have been developed for all expected routine maintenance, tests and inspections. These procedures include the following information: Equipment Identification[,] Required Tools and Equipment[,] Safety Hazards and Cautions[,] Step-by-Step Procedure[.] These procedures should be provided to the technician who will actually perform the work.
>
> . . .
>
> Each system component or subsystem included on the equipment list should have a maintenance, inspection and testing history record kept in the individual equipment file in which all activities are recorded.

Under the heading "Inspections and tests and their frequency/Documentation of results" the overview states:

> A schedule of periodic tests and inspections has been developed to ensure pressure boundaries, safety systems, and controls function to design standards. For all equipment the schedule will identify: Equipment name and/or specific identifier[,] Type of inspection[,] Carried out by[,] Frequency (At least)[,] Items Requiring Attention[.]
>
> Forms for Annual Inspections (completed forms in Volume III)
>> Annual visual inspections will be performed on each piece of equipment.
>> Recording of daily inspection information will be recorded on equipment log sheets.
>
> Daily Log Sheets & System Tours
>
> . . .
>> Each shift a qualified Operator will record specified readings on gauges, thermometers and other direct reading instrumentation. Additionally, the Operator will complete a thorough inspection tour of the system once every shift and annotate the Inspection Tour Checklist. One complete checklist will be filled out for each 24-hour period.

Out of Normal Readings

> The log sheets are used to document visual inspections. When out of normal readings are observed, the operation will take the necessary action to restore normal conditions. . . .

Sanderson's inspection and maintenance schedule document matches the description in the overview document for a "schedule of periodic tests and inspections." It is a table listing, for each type of equipment, types of inspection such as "Operational Maintenance" or "Inspection/Maintenance," who should carry them out, their frequency, and "Items Requiring Attention." The section for compressors lists "Pressure and Temperature Readings" as an item requiring attention but makes no reference to cutouts. The section for vessels lists "Controls, Safety Provisions" as items requiring attention. No part of the schedule refers to emergency stops.

The daily inspection forms are titled, "Refrigeration Check Sheet." They contain a series of printed tables that have rows labelled with a printed short phrase and columns with a printed equipment identifier. The cells are printed as blank and, in the examples provided, have been filled in by hand with either "ok" or a numerical value. In the compressors section, the potentially relevant row labels include "Suction Pressure," "Suction Temp," "Discharge Pressure," "Discharge Temp," "Oil Pressure," "Oil Temp," "Oil Return," and "Oil Level." There is no explicit mention of the cutouts. The vessel section contains potentially relevant labels of "Vessel Condition" and "Vessel Level." The monthly inspection forms have a similar format. For compressors, the one potentially relevant label is "Inspect Safety Cutouts." For vessels, potentially relevant labels include "Defrost & Inspect," "Vessel Condition," and "Liquid Level." There is no specific mention of the vessel level control. Neither the daily nor monthly forms mention emergency stops.

The annual forms appear to be a general template that has information specific to each piece of equipment additionally printed onto the form. The

compressor forms have a section for "Safety Cutouts" with typed values for "Low Pressure Cutout," "High Pressure Cutout," "Low Oil Pressure," and "High Oil Temp." There is also a printed table with columns "Requirement" and "Confirm." One row asks, "Is machine equipped with high pressure cutout?" and has a handwritten "yes." The vessel form is similar. The only potentially relevant piece asks, "Does it have control columns?" Otherwise, there is no mention of the pressure vessel level control. One annual form is titled, "Equipment Integrity Inspection – General." It has a list of printed questions and blank spaces under a "Yes or No?" column in which answers have been written by hand. One question asks, "Are emergency shut off switches accessible?"

The ALJ noted that the documents were checklists which contained "no instructions for performing the required procedures" and concluded that Sanderson therefore failed to comply with the requirement of § 1910.119(j)(2) to have written procedures for maintenance of process equipment. Sanderson first responds that the checklists and overview document do satisfy § 1910.119(j)(2) because they are written procedures and because they conform with industry standards.

A "procedure" is "the performance of particular actions, esp[ecially] considered in regard to method," "the established or prescribed way of doing something," or "[a] particular course or mode of action." *Procedure, n.*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/151775 (last visited May 27, 2020). The overview document and checklists do not contain any of the particular actions, methods, or ways of doing maintenance on compressor cutouts, the vessel level control, or the emergency stops. At best, they indicate that maintenance should be done on the cutouts and level control, but they do not even say that much for the emergency stop buttons. But the written documents contain no information about how to perform the maintenance.

That information does exist, because Sanderson's employees do in fact perform some maintenance on process equipment. A Sanderson employee testified that, for example, when filling out the daily check sheet for the pressure vessel, he looks at the level reading on the computerized level control and the reading on a manual sight glass and, if they match, writes down "ok" on the inspection form under "Vessel Level." But the only part of that procedure that is written is "Vessel Level." That is no procedure at all.

Sanderson contends that because the mechanical integrity program also requires an employer to train employees in the required maintenance procedures, the written procedures need only be specific enough to guide a trained employee. Sanderson claims that nonbinding guidance interpreting the standard supports that approach. We disagree. Reading the writing and training requirements as complementing, rather than restricting, one another is consistent with the standard's purpose, which the preamble describes as "requir[ing] a written program that would assure that process equipment receives careful, appropriate, regularly scheduled maintenance to assure its continued safe operation." Process Safety Management, 57 Fed. Reg. at 6389. Overall, "[p]rocess safety management is the proactive identification, evaluation and mitigation or prevention of chemical releases that could occur as a result of failures in process, procedures or equipment." 29 C.F.R. § 1910.119, App'x C. A requirement to reduce procedures to writing furthers the goal of ensuring that failures in those procedures may be addressed proactively. Written procedures also "ensure that tests and inspections are conducted properly and that consistency is maintained even where different employees may be involved." *Id.* That the regulation also requires employees be trained in the procedures does not diminish the importance with respect to those regulatory purposes of reducing the procedures to writing. Neither does it alter the plain-meaning requirement that the employer establish written

procedures. *See Randalls Food & Drugs, Inc. v. OSHRC*, 116 F. App'x 501, 502 (5th Cir. 2004) (unpublished) (rejecting the argument that another PSM requirement that procedures be reduced to writing was not violated by a lack of writing when employees were trained in the procedure).

Although Sanderson insists repeatedly in its briefs that the documents it provides comply with industry standard for PSM mechanical integrity maintenance procedures, it cites to only one point in the record that might support that claim. *See* FED. R. APP. P. 28(a)(8)(A) (requiring that arguments contain "citations to the authorities and parts of the record on which the appellant relies"); *United States v. Martinez-Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989) ("[I]t is counsel's responsibility to point out distinctly and specifically the precise matters complained of, with appropriate citations to the page or pages in the record where the matters appear."). The single cited support is a letter from the engineer who designed Sanderson's ammonia refrigeration system. It says, "Per OSHA 29 CFR 1910.119(j)(4)(i-iv) Mechanical Integrity, Inspection and testing, we have reviewed Mechanical Integrity inspection documentation for the closed ammonia refrigeration system equipment. . . . We find the inspections in keeping with industry standards for closed ammonia refrigeration system operation." That letter is unpersuasive for several reasons. First, Sanderson cites to no testimony from the letter's author explaining how he arrived at that conclusion. Second, the document discussed above that provides an overview of Sanderson's mechanical integrity maintenance program states that "Appendix III" contains "[w]ritten [m]aintenance [p]rocedures . . . for all expected routine maintenance, tests and inspections," including "[s]tep-by-[s]tep [p]rocedure[s]." It is possible that the letter's certification is based in part on those maintenance procedures supposedly contained in Appendix III, or on the representation that they exist, but no such written procedures have been entered into the record here. Third,

the letter references section (j)(4) of the PSM standard, which mandates inspections and tests of process equipment, but says nothing about the requirement for written maintenance procedures in section (j)(2). There is, therefore, no evidence that the industry interprets "written procedure" any differently than did the ALJ.

Sanderson also contends that interpreting the (j)(2) standard to require written instructions for how to perform the maintenance is contrary to law because (a) the standard is a performance standard which requires the Secretary to prove that Sanderson acted unreasonably or contrary to industry practice, (b) Sanderson could not have known of the violative condition because it relied on industry practice and experts to develop its maintenance procedures, and (c) applying the standard as the Secretary does violates Sanderson's right to fair notice.

None of Sanderson's reasonableness arguments are availing because the standard's plain language is sufficiently clear to put Sanderson on constructive notice that its conduct was deficient. The industry-custom requirement of performance standards only applies to standards that "do not identify specific obligations." *Thomas Indus. Coatings, Inc.*, 21 BNA OSHC 2283. And to satisfy the requirement of fair notice, the Secretary need only resort to external sources of clarity, such as industry practice, when "the language of the regulation is not specific enough" to satisfy the reasonableness test on its own. *Corbesco, Inc.*, 926 F.2d at 427. The standard here is quite specific about the need for "written procedures" for the maintenance of "process equipment." Sanderson's written documents contain no procedures whatsoever for the maintenance of compressor cutouts, the pressure vessel level control, or emergency stops, which are process equipment. Whether the standard is ambiguous about the level of detail required in the written procedures is

irrelevant when, as here, the employer has failed to comply with the standard at all.

Even if there were some ambiguity as to the meaning of "procedure," there is evidence that Sanderson had actual notice that a "procedure" requires an explanation of how to accomplish the task. Sanderson's overview of its mechanical integrity program separates "Maintenance procedures" from "Inspections and tests and their frequency/Documentation of results." The overview document states that Sanderson developed written maintenance procedures for "all expected maintenance tests and inspections" that include, among other information, "Step-by-Step Procedure[s]." The overview is not referring there to the schedule and checklists entered into the record because the overview describes those documents separately under "Inspections and tests and their frequency/Documentation of results." Save for the unpersuasive and inapplicable letter from its engineer, Sanderson cites to no evidence in the record suggesting otherwise. Sanderson's own documents show an understanding of the meaning of "procedure" applied here and even purport to have complied with the standard.

In sum, because the standard is clear on its face and there is evidence that Sanderson had actual notice of the standard's meaning, the application of § 1910.119(j)(2) in this manner is reasonable and violates neither fair notice nor due process. Beyond that, the Secretary is only required to prove that Sanderson knew of the "physical conditions constituting the violation," which Sanderson does not dispute. *See Calpine Corp.*, 774 F. App'x at 884.

The Secretary bore his burden with respect to all elements of a violation regarding Items 5a and 5b, and there is no due process issue with the interpretation of the regulations applied by the ALJ. Sanderson's petition for review is therefore DENIED.