# United States Court of Appeals
# for the Fifth Circuit

_____

No. 24-60026

_____

United States Court of Appeals
Fifth Circuit

**FILED**

July 10, 2025

Lyle W. Cayce
Clerk

Mar-Jac Poultry MS, L.L.C.,

*Petitioner*,

*versus*

Secretary, *United States Department of Labor*,

*Respondent*.

_____

Petition for Review from an Order of the
Occupational Safety & Health Review Commission
Agency No. 21-1347

_____

Before Dennis, Southwick, and Engelhardt, *Circuit Judges*.

Per Curiam:[*]

Mar-Jac Poultry, MS, LLC ("Mar-Jac") petitions for review of a final order of the Occupational Safety and Health Review Commission (hereinafter referred to as "OSHRC" or "the Commission") affirming the Secretary of Labor's citation alleging serious violations of two occupational safety and health regulations—29 C.F.R. § 1910.212(a)(1) and 29 C.F.R.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-60026

§ 1910.145(c)(3))—and assessing a penalty of $13,653 for each violation. The petition for review is DENIED.

I.

The Occupational Safety and Health Act of 1970 ("the Act"), 29 U.S.C. §§ 651–678, was enacted to "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). "The Act imposes a general duty on employers to furnish employees a workplace 'free from recognized hazards that are causing or are likely to cause death or serious physical harm," and "authorizes the Secretary of Labor to promulgate occupational safety and health standards." *Southern Hens, Inc. v. Occupational Safety & Health Rev. Comm'n*, 930 F.3d 667, 675 (5th Cir. 2019) (quoting 29 U.S.C. §§ 654(a)(1), 655(a)). "The Act assigns enforcement and rulemaking authority to the Secretary, while assigning adjudicative authority to the Commission, an independent agency." *Id.* Federal circuit courts of appeals adjudicate petitions requesting that orders of the Commission be modified or set aside. 29 U.S.C. § 660(a).[1]

The petition for review filed by Mar-Jac challenges the September 22, 2023 Decision and Order (the "Decision") rendered by the Administrative Law Judge ("ALJ") after an evidentiary hearing. The Decision became the

---

[1] Section 660(a) states, in pertinent part:

Any person adversely affected or aggrieved by an order of the Commission issued under subsection (c) of section 659 of this title may obtain a review of such order in any United States court of appeals for the circuit in which the violation is alleged to have occurred or where the employer has its principal office, or in the Court of Appeals for the District of Columbia Circuit, by filing in such court within sixty days following the issuance of such order a written petition praying that the order be modified or set aside.

*See* 29 U.S.C. § 660(a).

"Final Order" of the Commission on November 20, 2023, when the Commission had not (within thirty days of the date the ALJ's decision was docketed by the Commission's Executive Secretary) directed discretionary review.[2] As set forth in the Decision, the Commission affirmed the Secretary of Labor's November 22, 2021 Citation alleging "serious" violations of two occupational safety and health standards (29 C.F.R. § 1910.212(a)(1) and 29 C.F.R. § 1910.145(c)(3)) at Mar-Jac's Hattiesburg, Mississippi poultry processing facility, and assessing a penalty of $13,653 for each of the two violations.

"Though the ALJ's order became final only when the Commission declined to conduct discretionary review, we apply the same standard of review to the final decision here as we would if the Commission had directly issued its own decision." *Echo Powerline, L.L.C. v. Occupational Safety & Health Rev. Comm'n*, 968 F.3d 471, 476 (5th Cir. 2020) (quoting *Sanderson Farms, Inc. v. Occupational Safety & Health Rev. Comm'n*, 964 F.3d 418, 422 (5th Cir. 2020)). Agency actions, findings, and conclusions are set aside if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Southern Hens*, 930 F.3d at 675 (quoting § 706(2)(A)). Findings of fact are accepted "if they are supported by 'substantial evidence on the record considered as a whole.'" *Southern Hens*, 930 F.3d at 674 (quoting 29 U.S.C. § 660(a)). And, "[t]o the extent necessary to decision and when presented, [we] . . . decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

---

[2] *See* November 21, 2023 "Notice of Final Order"; September 22, 2023 "Notice of Decision."

No. 24-60026

## II.

The November 22, 2021 Citation and Notification of Penalty followed from the June 1, 2021 inspection and investigation of Mar-Jac's poultry processing plant in Hattiesburg, Mississippi, by Department of Labor–Occupational Safety and Health Administration ("OSHA") Compliance Safety and Health Officers ("CSHOs"),[3] as a result of a Mar-Jac employee—"B.B."—having suffered a fatal accident at the facility during the May 31, 2021 night shift.[4]  On the night of the accident, B.B. worked as a "floor person" performing housekeeping tasks around and in support of Mar-Jac's "Line 2" Meyn Maestro eviscerator. An eviscerator is a machine that disembowels poultry.

As of May 31, 2021, Mar-Jac had two Meyn-manufactured and installed Maestro eviscerators—referred to as "the Line 1 and Line 2 eviscerators"—at its Hattiesburg facility.  Both Meyn Maestro eviscerators were installed in 2014, but the Line 1 eviscerator was installed approximately nine months after the Line 2 eviscerator.[5]  The two eviscerators operated the same way, but the Line 1 eviscerator, unlike the Line 2 eviscerator, was equipped with outer metal doors enclosing the machine's rotating carousels.[6]

---

[3] The CSHOs are Patrick Whavers and Jermaine Davis.

[4] The statement provided by Mar-Jac then-Supervisor-Trainee Martaze Hammod reports that the night shift for the evisceration department begins around 8:18 p.m., and that there is a scheduled break for employees from 10:40–11:10 p.m. According to Hammod, B.B.'s accident occurred at 11:42 p.m. The OSHA "Investigation Summary" identifies the "event time" to have been 11:30 p.m.

[5] The Line 2 eviscerator was installed in February 2014; the Line 1 eviscerator was installed in November 2014.

[6] Although the Line 1 eviscerator's metal doors enclosed the machine's rotating carousels, opening the eviscerator's doors while it was operating did not cause the machine to stop moving.

No. 24-60026

Meyn Maestro eviscerators function automatically, i.e., human operators are not required, but employees can turn the machine off or lock and tag it out.  The September 22, 2023 Decision provides the following explanation of the machine's operations:

> After a cut removes glands from chickens' tails, the birds, which are slit open, enter the eviscerator. The eviscerator consists of two rotating parts, one holding spoons and the other holding cups. On the first carousel, which involves the spoons, the chickens hang upside down from shackles around their legs with their backs facing the inside of the machine. Oval-shaped metal plates or guide bars between the shackles hold the chickens' hips in place. The machine moves spoons down into the chickens, which move up. At this point, the chickens move down, and now-embedded spoons pull up and dislodge the viscera. In addition to the viscera, the eviscerators also remove the chickens' livers, spleens, and chest cavity contents during this process. The viscera and other parts of the chickens end up in a second rotating part containing cups. The cups cut the dislodged viscera and then drop them onto a pan below the carousel for disposal. The cups and spoons both rotate clockwise, and there is a six to seven-inch gap between the rotating carousels. [At Mar-Jac's Hattiesburg facility,] [t]he chickens move through the machine at a pace of approximately 175 birds per minute. At a typical processing facility, the pace is 144 birds per minute.
>
> * * *
>
> Employees can stop [the eviscerator] either by pulling on or contacting a stop cord nearly surrounding the machine[] or pressing a stop button. Since the accident, the stop cord is located 18 inches above the pan.  At the time of the accident, the cord was at least 6 feet above the facility floor. Employees used the cord to stop the machine if there was an issue with chickens on the line or to talk to supervisors.

*See* Decision at 3–4 (internal record citations omitted).

At Mar-Jac, evisceration floor personnel engage in general housekeeping activities around the eviscerators, including "washing the floors down with a water hose, washing equipment during non-production time, and empt[y]ing full trash cans." *See* "Job Description." These duties are additionally described as "[e]ither pick[ing] up, wash[ing], or squeegee[ing] debris to drains." *See* "Job Safety Assessment Form." Because the Line 2 eviscerator (to which B.B. was assigned) lacked the manufacturer-installed doors that surrounded the Line 1 eviscerator, the floor under and around the Line 2 eviscerator could become particularly messy. According to Mar-Jac's human resources manager, evisceration floor employees were to "keep[] the area clean" and "[t]hey may be squeegeeing the floor[,] . . . dumping condemn cans[,] [and] . . . spraying out pans, making sure they're not overflowing."

Although no one witnessed B.B.'s accident, it is apparent from the accident phot included in the record that his left arm and upper body became caught in the Line 2 eviscerator's larger carousel. The OSHA "Investigation Summary" reports: "Employee's left sleeve (near his hand) was caught on the Meyn Maestro Eviscerator and he was pulled on to the pan below the machine and against a horizontal support member for the eviscerator, pinning his body against the support and partially under the eviscerator's carousel."[7] His cause of death was blunt force injuries.

According to the postmortem examination report, B.B. suffered numerous cutaneous lacerations and abrasions, including lacerations in the

---

[7] The written statement of another Mar-Jac employee, Joseph Connor, who served as the "floor person" for Mar-Jac's other—Line 1—Meyn Maestro eviscerator on the night that B.B. was killed, reports: "I can tell [B.B.] was trying to get a bird from in the machine when he got "caught in [the] machine."

right temple and right side of the chin and abrasions on the right shoulder, anterior chest, and back; cervical and thoracic spine fractures, including transection of the seventh thoracic vertebrae and partial displacement into the right chest cavity; fractures of the sternum and all (anterior and posterior) ribs; lacerations to the lungs and liver; open, displaced fractures to the left arm (radius and ulna); and internal bleeding in the chest and abdominal cavities. A postmortem toxicology report revealed the presence of alcohol, marijuana, and d-methamphetamine in B.B.'s body at the time of the accident.

## III.

The two safety standards for which Mar-Jac received a citation and was found to have violated provide, in pertinent part:

Citation 1, Item 2: 29 C.F.R. § 1910.212 ("Machine Guarding")

§ 1910.212 General requirements for all machines.

(a) Machine guarding—

(1) Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are—barrier guards, two-hand tripping devices, electronic safety devices, etc.

(2) General requirements for machine guards. Guards shall be affixed to the machine where possible and secured elsewhere if for any reason attachment to the machine is not possible. The guard shall be such that it does not offer an accident hazard in itself.

(3) Point of operation guarding.

(i) Point of operation is the area on a machine where work is actually performed upon the material being processed.

(ii) The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

(iii) Special hand tools for placing and removing material shall be such as to permit easy handling of material without the operator placing a hand in the danger zone. Such tools shall not be in lieu of other guarding required by this section, but can only be used to supplement protection provided.

(iv) The following are some of the machines which usually require point of operation guarding:

(a) Guillotine cutters.

(b) Shears.

(c) Alligator shears.

(d) Power presses.

(e) Milling machines.

(f) Power saws.

(g) Jointers.

(h) Portable power tools.

(i) Forming rolls and calendars.

(4) Barrels, containers, and drums. Revolving drums, barrels, and containers shall be guarded by an enclosure which is interlocked with the drive mechanism, so that the barrel, drum, or container cannot revolve unless the guard enclosure is in place.

No. 24-60026

(5) Exposure of blades. When the periphery of the blades of a fan is less than seven (7) feet above the floor or working level, the blades shall be guarded. The guard shall have openings no larger than one-half ( ½ ) inch.

(b) Anchoring fixed machinery. Machines designed for a fixed location shall be securely anchored to prevent walking or moving.

*See* 29 C.F.R. § 1910.212.

Citation 1, Item 1: 29 C.F.R. § 1910.145(c)(3) ("Safety Signs"

§ 1910.145 Specifications for accident prevention signs[.]

(a) Scope.

(1) These specifications apply to the design, application, and use of signs or symbols (as included in paragraphs (c) through (e) of this section) intended to indicate and, insofar as possible, to define specific hazards of a nature such that failure to designate them may lead to accidental injury to workers or the public, or both, or to property damage. These specifications are intended to cover all safety signs except those designed for streets, highways, and railroads. These specifications do not apply to plant bulletin boards or to safety posters.

(2) All new signs and replacements of old signs shall be in accordance with these specifications.

(b) Definitions. As used in this section, the word sign refers to a surface on prepared for the warning of, or safety instructions of, industrial workers or members of the public who may be exposed to hazards. Excluded from this definition, however, are news releases, displays commonly known as safety posters, and bulletins used for employee education.

(c) Classification of signs according to use—

(1) Danger signs.

(i) There shall be no variation in the type of design of signs posted to warn of specific dangers and radiation hazards.

10

(ii) All employees shall be instructed that danger signs indicate immediate danger and that special precautions are necessary.

(2) Caution signs.

(i) Caution signs shall be used only to warn against potential hazards or to caution against unsafe practices.

(ii) All employees shall be instructed that caution signs indicate a possible hazard against which proper precaution should be taken.

(3) Safety instruction signs. Safety instruction signs shall be used where there is a need for general instructions and suggestions relative to safety measures.

[(d)-(f) Omitted.]

*See* 29 C.F.R. § 1910.145.

## IV.

"Despite its lofty goals, the Act did not create a strict liability regime." *Southern Hens*, 930 F.3d at 675. "Rather, 'the Act seeks to require employers to protect against preventable and foreseeable dangers to employees in the workplace.'" *Id.* (quoting *W.G. Yates & Sons Constr. Co. v. O.S.H.R.C.*, 459 F.3d 604, 607 (5th Cir. 2006)). To establish a violation of an occupational safety and health standard promulgated pursuant to the authority granted by the Act, the Secretary must prove by a preponderance of evidence that: (1) the cited standard applies; (2) the employer failed to comply with the cited standard; (3) employees had access or exposure to the noncompliant conditions; and (4) "the employer had actual or constructive knowledge of the conditions through the exercise of reasonable due diligence." *Sanderson Farms, Inc. v. Perez*, 811 F.3d 730, 735 (5th Cir. 2016); *see also Southern Hens*, 930 F.3d at 675. In determining whether the Secretary has proved employee access or exposure to an identified hazard, the relevant

inquiry is whether "it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger." *Southern Hens*, 930 F.3d at 681 (quoting *Fabricated Metal Prods., Inc.*, 18 BNA OSHC 1072 (No. 93-1853, 1997), 1997 WL 694096, at *3). To make this determination regarding a machine, we consider "the manner in which [it] functions and how it is operated by the employees." *Rockwell Int'l Corp.*, 9 BNA OSHC 1092, 1097–98 (No. 12-470, 1980), 1980 WL 10706, at *6), *overruled on other grounds by George C. Christopher & Sons, Inc.*, 10 BNA OSHC 1436 (No. 76-647, 1982), 1982 WL 189089.

If a violation is established, the employer may avoid liability under the Act by demonstrating that the violation resulted from unpreventable employee misconduct. To establish that affirmative defense, the employer bears the burden of proving that it: "1) has established work rules designed to prevent the violation, 2) has adequately communicated these rules to its employees, 3) has taken steps to discover violations, and 4) has effectively enforced the rules when violations have been discovered." *Angel Bros. Enterprises, Ltd. v. Walsh*, 18 F.4th 827, 832 (5th Cir. 2021) (quoting *W.G. Yates & Sons*, 459 F.3d at 609 n.7).

A. 29 C.F.R. § 1910.212(a)(1) — Machine Guarding

As set forth in the September 2023 Decision, the Commission affirmed the November 22, 2021 Citation's first item and associated penalty, concluding that Mar-Jac had violated the general "machine guarding" standard, 29 C.F.R. § 1910.212(a)(1), such that its floor personnel were regularly and predictably exposed to known, unguarded "caught-in" hazards created by the combination of Mar-Jac's Line 2 eviscerator's rotating carousels and high operating speed. Arguing that the Commission's decision is erroneous

and should be reversed, Mar-Jac contends that it complied with the cited standard insofar as it applies to its Line 2 eviscerator.

Specifically, Mar-Jac maintains that it did not expose its employees to a known hazard, and did not have actual or constructive knowledge of any violative conditions. Emphasizing the absence of previous accidents involving Meyn Maestro eviscerators, Mar-Jac reasons that neither the mere existence of moving parts nor the occurrence of an accident is legally sufficient to establish a hazard, or that the employer knew or, in the exercise of reasonable diligence, should have known of a hazard. Mar-Jac additionally contests the Commission's determination that, at the time of the fatal accident, B.B. was "cleaning" the machine. According to Mar-Jac, the evidence demonstrated that B.B.'s "floor person" housekeeping duties were limited, as the name suggests, to upkeep of the area surrounding the Line 2 eviscerator, and that B.B. had been forbidden by training and practice to reach into the machine while it was in operation. In contrast, Mar-Jac emphasizes, a dedicated sanitation crew "deep cleans" the eviscerators during Mar-Jac's second shift *after* processing has stopped.

Mar-Jac also contends that the Commission wrongly concluded that a "reference to industry custom and practice was unnecessary" to its assessment of Mar-Jac's compliance with § 1910.212(a)(1)'s "machine guarding" requirements, and, as a result, erroneously relieved the Secretary of the burden of proving the existence of a known hazard and applicable means of abatement. Reiterating the absence of a history of accidents involving the Meyn Maestro eviscerator, Mar-Jac maintains that, contrary to the Commission's conclusion, the Line 2 eviscerator (to which B.B. was assigned) was effectively guarded, in accordance with industry custom and practices, by location, pull-stops, and emergency stop buttons.

Defending the Commission's decision, the Secretary maintains that Mar-Jac was required, but failed, to physically guard the Line 2 eviscerator's carousels and, as a result, its evisceration floor employees were exposed to known "catch point" and "rotating parts" hazards.[8] In support of its position, the Secretary emphasizes the Commission's determination that Mar-Jac's employees, including supervisors, routinely accessed the eviscerator's zone of danger in order to remove hanging material from the moving carousels by hand, while the machine was operating, rather than first stopping the machine. Given that practice, the Secretary argues, Mar-Jac's guarding methods provided inadequate protection against known hazards of the sort addressed in § 1910.212(a)(1) and, thus, did not satisfy the standard's requirements. The Secretary also disagrees that establishing a violation of § 1910.212(a)(1)'s requirements necessitates consideration of industry custom and practice, arguing that the provision's text sufficiently specifies the circumstances requiring implementation of safety measures. And, in any event, the Secretary contends, the machine manufacturer's recognition of the associated hazards sufficiently imparts industry custom and practice such that Mar-Jac's conduct was unreasonable.

We have carefully considered applicable law, the administrative record, and the parties' submissions and oral argument. On the record before us, we find no reason to set aside the Commissioner's determinations regarding Mar-Jac's violation of § 1910.212(a)(1)'s "machine guarding" requirements.

As set forth in the September 2023 Decision, the Commission, upon conducting an evidentiary hearing, was convinced that Mar-Jac employees

---

[8] The Secretary argues: "[T]o physically guard hazards, guarding methods must prevent employees from entering the zone of danger."

and supervisors, rather than first stopping the machine in accordance with the manufacturer's instructions, instead frequently breached the eviscerator's zone of danger in order to remove entangled viscera and misaligned chickens—from the eviscerator's pan *and* rapidly moving carousels—by hand. Moreover, this "practice was not infrequent; it was pervasive." As discussed in the Decision, these findings are based on, and fully supported by, the hearing testimony and statements of two United States Department of Agriculture ("USDA") inspectors who worked in Mar-Jac's plant, and the written statement of another Mar-Jac employee, Joseph Connor, who served as the "floor person" for Mar-Jac's other —Line 1—Meyn Maestro eviscerator on the night that B.B.was killed.

One of the USDA inspectors testified that she had seen Mar-Jac employees putting their hands in the eviscerator's carousel, pulling out birds and guts. The other inspector testified that she had observed employees use a three-foot metal pole with a hook at the end to remove birds that they could not reach. But, she added, "most of the time," they used their hands to remove viscera from the pan, or to reach up and pull hanging pieces from the carousel. She testified that floor persons "mainly" engaged in this practice, though supervisors and maintenance personnel also did so, and would reach into the machine to remove whole chickens that were stuck (or misaligned) and could cause the machine to misfeed.

Connor's statement revealed that he would "put [his] hand in the machine when [a] bird gets stuck in the Maestro," and that, on the night that B.B. was killed, he "had to stick [his] hand in the machine to get stuck chickens out ten times." He explained that, "[i]f we don't get the birds out that are stuck[,] it makes the machine back up and dirty." Connor additionally maintained that "[a]ll of the supervisors have seen [him] grab the chickens out of the machines," and that "[t]hey never stop the machine while [he] work[s]." Indeed, Connor asserted that his supervisor had previously

instructed him to remove stuck chickens from the eviscerators by "sticking [his] hand in the machine," and that he had been trained "to put [his] hand in a certain place in the [carousel] so [he would not] get hurt." Even so, according to Connor, the Line 2 eviscerator "gets ["bumps"] your hand when you go to get a chicken" and, in the past, his (thinner) jacket sleeve had been "snagged" by the eviscerator.

Notably, the September 2023 Decision reveals that the ALJ made the foregoing factual determinations despite having also carefully assessed Mar-Jac's contrary position, which references the hearing testimony of Mar-Jac Human Resources Manager Latissha Hill, the out-of-court statement of Mar-Jac's then-Supervisor-Trainee Martaze Hammod,[9] Mar-Jac's written "Plant Rules," and company documentation outlining "floor person" duties. The ALJ also considered the worksheets completed by the OSH Compliance Safety and Health Officers, Mar-Jac's discovery responses, and numerous photographs, including a photo depicting the post-accident location and positioning of B.B.'s body in the belatedly stalled eviscerator. In short, though another factfinder may have decided things differently, the Commission made credibility determinations that are unquestionably supported by substantial record evidence.[10]

---

[9] Even Mar-Jac's then-Supervisor-Trainee Martaze Hammod admitted: "Birds that drop on the pan are retrieved by hand unless out of reach." But, he adds, "when the chicken is half off [the] shackles" and "keeps going around," he adds, "[u]nless [a] bird[] fall off[,] we don't touch it."

[10] Citing the requirements of the hearsay exceptions set forth in Rule 804(b) of the Federal Rules of Evidence, Mar-Jac argues the ALJ erroneously admitted Connor's out-of-court statement. Mar-Jac, however, provides no legal authority to support its position, which ignores the plain language of Federal Rule of Evidence 801(d)(2)(D) regarding statements that are *not* hearsay and thus do not require the application of a hearsay exception to be admissible evidence. Specifically, statements offered against an opposing party are not hearsay under this rule if the party's employee offered statements on matters within the scope of employment. Fed. R. Evid. 801(d)(2)(D). Conner's statement

No. 24-60026

We likewise are not convinced that the Commission erred in concluding that Mar-Jac employees were regularly and predictably exposed to hazards presented by the Line 2 eviscerator's unguarded rotating carousels and the high speed at which the machine operated. The ALJ noted that, in addition to the manufacturer's warnings, Mar-Jac's own discovery responses "recognize[] that cleaning chicken parts from a Meyn Maestro Eviscerator while the machine is operating creates a risk of catch point/rotating parts hazard[s]." Given the finding that Mar-Jac's eviscerator employees and supervisors routinely accessed the machine's zone of danger to remove material from and under the moving carousels, by hand, and that such conduct was highly visible and therefore discoverable by upper management through reasonable diligence, substantial evidence supports the Commission's determination that the Line 2 eviscerator presented a known "caught-in" hazard, and that Mar-Jac had knowledge of the violative condition.

For similar reasons, our precedent does not require the Secretary to have put forth evidence, in this instance, of how other employers utilizing Meyn Maestro (or comparable) eviscerators have identified and addressed safety hazards in order to establish Mar-Jac's knowing violation of the "machine guarding" standard. In arguing the contrary, Mar-Jac contends

---

addressed Mar-Jac's evisceration floor operations and instructions that he received regarding performance of his job duties. Accordingly, his out-of-court statement is not hearsay and consideration of the hearsay exceptions in Rule 804(b) is unnecessary. *See* FED. R. EVID. 801(d)(2)(D); FED. R. EVID. 804(b).

Nor has Mar-Jac demonstrated that the ALJ was not entitled to attribute more weight to Connor's out-of-court statement than that attributed to the out-of-court statement of another Mar-Jac employee—then-Supervisor-Trainee Martaze Hammod. In any event, the USDA inspectors' consistent hearing testimony regarding employee practices at the plant provides substantial corroborating evidence.

that § 1910.212(a)(1) is a "performance standard," and is violated only where the Secretary proves that the employer either failed to adhere to "the general practice in the industry" or "had clear actual knowledge" that the precaution in question "was necessary under the circumstances." *S & H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273, 1285 (5th Cir. 1981). Referencing *Sanderson Farms*, 964 F.3d at 428, Mar-Jac maintains: "This Court has established that a performance standard applies 'when there is an undefined hazard necessitating the application of reasonableness or industry practice to determine what hazard means and therefore when the standards apply.'" Mar-Jac also cites *S & H Riggers & Erectors, Inc.,* 659 F.2d at 1273, and *B&B Insulation, Inc. v. OSHRC*, 583 F.2d 1364, 1371 (5th Cir. 1978), in support of the proposition that "[an] employer whose activity has not yet been addressed by a specific regulation and whose conduct conforms to the common practice of those similarly situated in his industry is entitled to rely on industry practice as setting the standard for compliance."

In the context of occupational safety and health regulations, "'performance standards' are those that 'require an employer to identify the hazards peculiar to its own workplace and determine the steps necessary to abate them.'" *Sanderson Farms*, 964 F.3d at 427 (quoting *Thomas Indus. Coatings, Inc.*, 21 BNA OSHC 2283 (No. 97-1073, 2007)). "Because performance standards . . . do not identify specific obligations, they are interpreted in light of what is reasonable." *Id.* Expressing "reluctance to treat most OSH Act regulations as performance standards," our decision in *Echo Powerline* highlighted "two hallmarks of performance standards":

> First, a performance standard "establishes an end result that the employer chooses how to work toward." *Sanderson Farms,* 964 F.3d at 428. By contrast, a specification standard "does not set a goal for an employer to meet with flexible methods." *Id.*; *see also Lowe Constr. Co.*, 13 BNA OSHC 2182 (No. 85-1388, 1989), 1989 WL 223356, at *3 (explaining that "[t]he

entire purpose of a performance standard is to allow flexibility not available in specification standards"). Second, a performance standard "is so general as to require definition by reference to industry standards for the regulation to be reasonable." *Sanderson Farms*, 964 F.3d at 428 (citation omitted). Specification standards, in contrast, are "explicit and unambiguous" and provide "fair notice on [their] own. *Id.* [Finally], "[m]any [] if not most" OSHA regulations "are sufficiently specific concerning the circumstances in which safety precautions must be taken that adequacy of notice is not a significant problem" and thus are not treated as performance standards." *S&H Riggers,* 659 F.2d at 1280.

*Echo Powerline,* 968 F.3d at 478 (additional internal citations omitted).

As noted, the general "machine guarding" standard at issue here, § 1910.212(a)(1), requires employers to use "[o]ne or more methods of machine guard[s] . . . to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks," and illustrates methods of compliance by providing nonexhaustive examples of guarding—"barrier guards, two-hand tripping devices, electronic safety devices, etc." § 1910.212(a)(1). " P o i n t of operation" is defined as "the area on a machine where work is actually performed upon the material being processed." § 1910.212(a)(3)(i). The regulation further directs that "in the absence of applicable specific standards," point of operation guarding for "machines whose operation exposes an employee to injury . . . *shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle*." § 1910.212(a)(3)(ii) (emphasis added). This provision contemplates *physical* guards or barriers, if feasible, rather than "guarding by distance." *Southern Hens*, 930 F.3d at 680 (emphasis added).

In this instance, our resolution of Mar-Jac's petition for review does not necessitate that we decide whether 29 C.F.R. § 1910.212(a)(1) is a "performance standard," a "specification standard," or (as the Secretary argues) a hybrid of the two, and/or undertake to otherwise delineate the circumstances when consideration of industry standards is necessary and/or appropriate. On the record before us, even if we assume that industry custom and practice must be considered in order to establish that Mar-Jac had sufficient notice of § 1910.212(a)(1)'s requirements, Mar-Jac's challenge to the Commission's decision still is unavailing.

In addition to arguing (to no avail) that its Line 2 eviscerator's operations presented no hazards to its evisceration "floor person" employees, Mar-Jac also maintains that the manufacturer-installed red "safety pull stop cord" surrounding the machine's carousels provided any guarding that was necessary. However, considering Mar-Jac personnel's pervasive practice of attempting to remove chicken parts from and under the eviscerator's quickly moving carousel by means of an outstretched hand, the safety pull stop cord's position, *six feet above the ground*, rendered it largely inaccessible to employees undertaking this undisputedly hazardous task. Indeed, considering the evidence presented, the Commission specifically found that that the cord's height allowed Mar-Jac employees to "easily bypass it to enter the [machine's] zone of danger and therefore it did not constitute an acceptable method of machine . . . guarding." *See* Decision at 12; *id*. (citing *Riverdale Mills Corp. v. OSHRC*, 29 F. App'x 11, 1st Cir. 2002)(unpub.) (reasoning that trip wire was not an appropriate guarding method because it "did not prevent entry into point of operation or other hazardous area)).

In other words, on this record, it is evident that Mar-Jac essentially employed *no* safeguarding measures for this undeniably hazardous, yet quotidian, aspect of its evisceration operations. And it points to *no* evidence

or authority recognizing such complete inaction as the applicable industry custom and practice. *Cf. Sanderson Farms,* 964 F.3d at 428 ("Whether the standard is ambiguous about the level of detail required in the written procedures is irrelevant when, as here, the employer has failed to comply with the standard at all.").[11]

Furthermore, the provisions of the manufacturer's product manual addressing the eviscerator's hazards, and required safety measures, sufficiently manifest pertinent industry custom and practices and, in any event, demonstrate the clear inadequacy and unreasonableness of Mar-Jac's safety measures for evisceration-floor personnel. Specifically, during the evidentiary hearing, Mar-Jac's proffered expert, Clyde Payne, acknowledged that chapter 5 of the Meyn manual identifies "entanglement hazards due to rotating parts or conveyer systems" as an operations hazard. Payne's testimony also acknowledges that Section 5.3.2 of the Meyn manual—entitled "Safety Measures During Operation"—instructs users to "[e]nsure that no persons are on top, inside[,] or under the machine while in use." Particularly pertinent here, the Meyn manual also instructs that the emergency stop switch on the machine must be operated *before* maintenance, "service works," and cleaning.

---

[11] Given the Commission's factual findings, Mar-Jac's repeated reliance on the opinion testimony of its expert witness, Clyde Payne —that the "emergency pull stop cord is an industry-accepted method of guarding the carousel"—is unfounded and approaching disingenuous. Although the six-foot high emergency pull stop cord might constitute sufficient "guarding" in poultry processing plants where floor employees adhere to safety rules and are *not* regularly reaching their hands down into, under, and across the rapidly moving and rotating parts of an eviscerator, it seems obvious that, given Mar-Jac's plant practices, its emergency pull cord certainly did not satisfy § 1910.212's guarding requirements.

Consistent with the Meyn product manual, two manufacturer-installed safety decals affixed to the Line 1 eviscerator's doors recognize and warn: "DANGER: WATCH YOUR HANDS AND FINGERS" and "DANGER! Pinch Point: KEEP HANDS CLEAR WHILE MACHINE IS OPERATING: Will result in serious injury." The first decal includes a symbol depicting a hand with a fractured finger. The latter decal includes symbols depicting finger amputation and a hand caught between two rotating parts.

Similarly, although the Commission's factual findings reveal that Mar-Jac did *not* follow or enforce its own written "Plant Safety Rules to Remember" and "Safety Responsibilities" training materials, those documents nevertheless demonstrate Mar-Jac's awareness of the hazardous nature of its evisceration operations and the resulting necessity of machine guarding that would protect workers from hazards such as "point of operations, nip points, and moving parts" and prevent workers' body parts from entering a machine's "danger zone." *See* Mar-Jac Plant Safety Rule 7 ("DO NOT REACH INTO ANY TYPE OF MACHINERY WITHOUT FIRST TURNING IT OFF."); Mar-Jac Plant Safety Rule 23 ("AVOID WEARING LOOSE FITTING CLOTHES WHICH CAN GET CAUGHT IN EQUIPMENT."); Mar-Jac Training Tool Document: "Machine guards: A last line of defense." (describing OSHA requirement of machine guards—e.g., "barrier guards that keep workers' body parts away from a machine's moving parts," "two-hand tripping devices" and "electronic devices that can sense when something is in the point of operation and prevent the machine from running"—to protect employees from hazards associated with a machine's moving parts).

Accordingly, for these reasons, Mar-Jac's challenge to the Commission's determination that it violated the "machine guarding" requirements of 29 C.F.R. § 1910.212(a)(1) is rejected.

B. 29 C.F.R. § 1910.145(c)(3) — "Safety Instruction Signs"

The Commission additionally found that Mar-Jac violated the "safety instruction signs" standard, 29 C.F.R. § 1910.145(c)(3), by not posting signs warning/instructing employees about the hazards associated with the Line 2 eviscerator's rotating carousels. According to § 1910.145(c)(3), "[s]afety instruction signs shall be used where there is a need for general instructions and suggestions relative to safety measures." The Commission also concluded that Mar-Jac's violation of the "safety instruction signs" standard is properly characterized as "serious" and that the assessed penalty of $13,653 is appropriate. On the record before us, we find no reason to set aside any of these rulings.

On the date of B.B.'s fatal accident, Mar-Jac's Line 2 eviscerator lacked the manufacturer-installed exterior doors that enclosed the Line 1 machine's rotating carousels. Significantly, moreover, the Line 2 eviscerator to which B.B. was assigned also lacked the safety instruction signs that the Line 1 eviscerator had. As previously explained, two safety decals affixed to the Line 1 eviscerator's doors provide written and pictograph "Danger" warnings, which referenced the machine's "pinch points" and the possibility of serious injury, instructed employees to "KEEP HANDS CLEAR WHILE MACHINE IS OPERATING, and depicted a hand caught between two rotating parts and hand/finger injuries, including amputation. And no satisfactory explanation for this safety instruction disparity has been provided.

We have concluded that substantial evidence supports the Commission's determination that Mar-Jac floor employees and supervisors routinely accessed the Line 2 eviscerator's zone of danger in order to remove extraneous or misaligned chicken parts—*with their hands while the machine was operating*—such that floor employees were regularly and predictably exposed to caught-in hazards created by the machine's rotating carousels and

high operating speed. Given that determination, and our consideration of the signage available to Mar-Jac (as evidenced by the safety decals affixed to the Line 1 eviscerator), we likewise conclude that, in *this* instance, the Commission's determinations regarding the Line 2 eviscerator's need for safety instruction signs are also supported by substantial evidence.

In addition to protesting that any violation of 29 C.F.R. § 1910.145(c)(3) occurred, Mar-Jac also challenges the Commission's classification of the violation as "serious" (rather than "not serious") and assessing a penalty of $13,653. *See* 29 U.S.C. § 666(a)–(c) (establishing maximum penalty amounts with regard to whether a violation is "willful or repeated," "not serious" or "serious"); *see also Perez*, 811 F.3d at 737 ("A violation of [a safety standard] is designated as serious, not serious, or *de minimis*." (quoting *Phoenix Roofing, Inc. v. Dole*, 874 F.2d 1027, 1032 (5th Cir. 1989)). A violation of an occupational health and safety standard promulgated pursuant to the Act is serious (rather than non-serious) when "there is a substantial probability that death or serious physical harm could result from a condition [or practice] . . . unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C. § 666(k); *see also Southern Hens*, 930 F.3d at 675.

In *East Texas Motor Freight, Inc. v. Occupational Safety & Health Review Comm'n*, this court explained that "a violation is 'serious' if it 'make(s) possible an accident involving a substantial probability of death or serious injury.'" 671 F.2d 845, 849 (5th Cir. 1982) (quoting *Shaw Constr., Inc. v. Occupational Safety & Health Review Comm'n*, 534 F.2d 1183, 1185 (5th Cir. 1976)). And in *Shaw Construction,* the court clarified that a violation may be determined to be serious "where, although the accident itself is merely possible . . . there is a substantial probability of serious injury if it does occur." 534 F.2d at 1185 n.4 (internal quotation marks and citation omitted).

Regarding the "serious" classification of the violation and the resulting $13,653 penalty,[12] the September 2023 decision explains that the Secretary established a "direct and immediate relationship" between the violative condition—the lack of a safety instruction sign—and occupational safety. The decision additionally reports that "[d]eath or serious physical harm would result from [Mar-Jac's] failure to have and enforce a safety sign or instruction warning employees against placing their hands in the zone of danger," as evidenced by B.B.'s horrific death in this case.

On the instant record, the likelihood of a workplace accident resulting from Mar-Jac's safety violations is well-supported. The same is true of the substantial probability that such an accident would involve employee death or serious injury. Indeed, Mar-Jac does not dispute the detrimental consequences that bodily contact with the fast-moving carousels could have. Yet, despite these well-recognized dangers, a dearth of machine safeguards, and supervisory disregard of pertinent work conduct rules, Mar-Jac also failed to post appropriate safety signs warning employees about the caught-in hazards associated with the Line 2 eviscerator. Finally, the physical conditions giving rise to Mar-Jac's violations were open and obvious, thus establishing Mar-Jac's knowledge of the violation. Therefore, the Commission correctly characterized Mar-Jac's safety-signs violation as serious.

---

[12] Regarding the penalty amount, the Commission is granted authority to assess all penalties prescribed by § 666, "giving due consideration to the appropriateness of the penalty with respect to the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the history of previous violations." *See* 29 U.S.C. § 666(j).

## C. Affirmative Defense

The Commission also found that Mar-Jac had failed to meet its burden of proof regarding the affirmative defense of "unpreventable employee misconduct." To establish that affirmative defense, the employer bears the burden of proving that it: "1) has established work rules designed to prevent the violation, 2) has adequately communicated these rules to its employees, 3) has taken steps to discover violations, and 4) has effectively enforced the rules when violations have been discovered." *Angel Bros. Enterprises,* 18 F.4th at 832 (quoting *W.G. Yates & Sons*, 459 F.3d at 609 n.7).

Challenging the Commission's assessment of the defense, Mar-Jac contends that it had a "comprehensively robust safety program, [] a rule prohibiting employees from reaching into the eviscerator while it was operating," and evidence (a post-mortem toxicology report) that B.B. was under the influence of drugs and alcohol at the time of his accident. As previously noted, Mar-Jac also contests the Commission's determination that, at the time of the fatal accident, B.B. was "cleaning" the machine. According to Mar-Jac, the evidence demonstrated that B.B.'s "floor person" job duties involved only attention to the surrounding floor, and that he had been forbidden to reach into a machine while it was in operation.

We ascertain no error in the Commission's determination. Here, the record shows that Mar-Jac had a safety program, and a work rule prohibiting employees from reaching into the eviscerator while it was operating. But Mar-Jac did not prove that the company adequately communicated its work rule to relevant employees, took reasonable steps to discover violations of the rule, and effectively enforced the rule. Rather, as discussed, substantial evidence supports the Commission's determination that the exact opposite was true. Specifically, floor personnel and supervisors regularly and openly violated this rule. In fact, Joseph Conner, another floor person, reported that

his supervisor had previously instructed him to remove "[chicken] remains" from the eviscerators by hand and that, on the night of B.B.'s accident, he had employed that technique several times.

In this instance, the Commission's rejection of B.B.'s intoxication as a successful affirmative defense is likewise supported by substantial evidence and applicable law. As an initial matter, the only evidence we have of B.B.'s intoxication and its potential adverse effects is the post-mortem toxicology report. Notably, none of the Mar-Jac employees who worked on the night of his fatal accident reported any impaired or otherwise out-of-the ordinary conduct by B.B. And, even if we assume that intoxication was a contributing cause of B.B.'s accident, Mar-Jac has not argued, much less shown, that putting one's unprotected hand in close proximity to the eviscerator's unguarded, fast-moving carousels is safe *unless* that person is under the influence of the drugs and alcohol to the same extent as B.B.

In any event, Mar-Jac's violations are determined, in this instance, by its departure from OSHA safety standards addressing machine guarding and safety signage requirements, *not* regulations prohibiting workers from undertaking certain duties while under the influence of alcohol and/or illegal drugs. Furthermore, as the ALJ reasoned, there was no evidence that any of the other Mar-Jac employees who frequently placed their hands in the eviscerator's zone of danger also were intoxicated. Rather, the record reveals that they did so in accordance with Mar-Jac's accepted plant practices.

In other words, even if B.B.'s reach into the Line 2 eviscerator on the night of his death had *not* resulted in bodily injury, the cited violations still would exist, and the affirmative defense still would not apply, because the Line 2 eviscerator's carousels lacked effective safeguards and safety warning signs *and* Mar-Jac failed to enforce its workplace safety rule purporting to prohibit such hazardous employee conduct. Indeed, as the ALJ determined,

No. 24-60026

Mar-Jac's floor persons and supervisors "flagrantly ignored" and "pervasively" violated its rule prohibiting employees from reaching into the eviscerator while it was operating.

V.

Mar-Jac's petition for review challenges the Commission's determinations regarding: (1) its alleged violations of 29 C.F.R. § 1910.212(a)(1) and 29 C.F.R. § 1910.145(c)(3); and (2) the classification of the violation of 29 C.F.R. § 1910.145(c)(3) as "serious." For the reasons stated, Mar-Jac's challenges to the Commission's Final Order are unavailing.[13] Accordingly, Mar-Jac's petition for review is DENIED.

_____

[13] In addition to challenging the Commission's determinations regarding the "machine guarding" and "safety instruction signs" standards, 29 C.F.R. § 1910.212(a)(1) and 29 C.F.R. § 1910.145(c)(3), Mar-Jac also contends that the ALJ improperly amended the Secretary's citation post-hearing, relative to the applicable "zone of danger," and that it was thereby prejudiced. This argument is unavailing. To the extent that there is or has been any lack of clarity or specificity regarding the parameters of the applicable "zone of danger," Mar-Jac could and should have sought to rectify the matter during the course of the underlying administrative proceeding. Moreover, on the showing made, the argument presents nothing more than a red herring.